CORONADO OIL COMPANY, a Colorado Corporation, Appellant (Plaintiff),

v.

John A. GRIEVES, Joann Grieves, Madeline Grieves, Thomas B. Grieves, Marie Grieves, Ruth K. Graham, Neal Reisland, Hazel Reisland, The Federal Land Bank of Omaha, and all Unknown Owners Who May Claim an Interest in the Subject Matter of this Action, Appellees (Defendants).

No. 5571.

Supreme Court of Wyoming.

March 15, 1982.

J. John Sampson, Newcastle, and Joseph M. Montano (argued), and Vicki J. Fowler, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for appellant.

Chester S. Jones, Newcastle, and Jon Mattson (argued), Deadwood, S. D., signed the brief on behalf of appellees Grieves.

Thomas L. Whitley (argued), Newcastle, for appellees Reislands.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This is the second time for this condemnation case to be on appeal. See *Coronado Oil Company v. Grieves, et al.,* Wyo., 603 P.2d 406 (1979). Following remand for further proceedings, a jury trial eventually ensued to determine just compensation for the taking by appellant (Coronado) of an easement or way of necessity across lands of the appellees (Grieves) (Reisland). The jury returned a verdict finding just compensation to be $132,000.00 for a road easement across the Grieves property and $161,000.00 for a road easement across the Reisland property. The trial judge entered a judgment on the verdict accordingly. A supersedeas bond has been posted by appellant.

On appeal, appellant raises as issues:
"I. Did the Court commit prejudicial error by allowing opinions of just compensation which were not tied to a 'before and after' valuation of the property and were based on speculation and conjecture?"

Our answer will be yes.

"II. Was it prejudicial error to allow the jury to consider testimony regarding trespass and other tortious acts by third parties?"

Our answer will be yes.

"III. Was it prejudicial error to allow the jury to consider testimony which was speculative and conjectural; evidence which was not tied to activities of the

Plaintiff; and evidence of personal inconvenience?"

Our answer will be yes.

"IV. Did the Court commit prejudicial error in admitting an agreement between an oil company and Defendant for payment for the use of Defendant's roads as evidence of the difference between the value of Defendant's property before the taking and the value after the taking?"

Our answer will be yes.

"V. Do the actions of the trial court in inviting a motion to strike Plaintiff's expert witness's testimony; striking said testimony because it 'shocked the conscience of the court'; reversing its ruling and reinstating said testimony after the witness was no longer available for examination; and refusing to grant a mistrial constitute prejudicial error?"

Our answer will be yes.

"VI. May an award which exceeds the testimony of any witness be allowed to stand?"

Our answer will be no.

"VII. Were the cumulation of errors so prejudicial that justice requires a new trial?"

We need not answer because any one of the foregoing errors would justify reversal and remand.

We will reverse and remand for a new trial on the issue of just compensation.

When this case was first before the court, it was held that Coronado was authorized to condemn a right-of-way across the Grieves and Reisland lands to reach its federal oil and gas leases situate in Weston County. After the previous decision by this court, access was acquired by posting a bond, Rule 71.1(d)(2), W.R.C.P. Appraisers were appointed, Rule 71.1(e), W.R.C.P. and they made, subscribed and filed with the clerk of the district court a certificate of their ascertainment and assessment of compensation proper to be made to the defendants, Rule 71.1(h), W.R.C.P. The return of the appraisers fixed compensation to be paid for the Grieves land at $15,201.25 and for the Reisland land, $15,865.00. Coronado,

not satisfied with the award, filed a timely request for trial by jury, Rule 71.1(j), W.R.C.P. The jury trial resulted in the verdict and judgment heretofore mentioned.

The right-of-way condemned, 30 feet in width, embraced 9.61 acres of the Grieves property and 14.92 acres of the Reisland property and constituted:

" * * * an easement of access or private way of necessity for the exploration, development, production and marketing of oil and gas pursuant to the terms of Plaintiff's federal oil and gas leases, including the use thereof as a mine truck haul road."

The date of taking was fixed at November 10, 1980, when Coronado was granted possession prior to the trial. The verdict was dated June 12, 1981. The judgment on the verdict was entered July 2, 1981.

■ The landowners in eminent domain cases have the burden of proving the just compensation to which they are entitled. *State Highway Commission v. Laird*, Wyo., 426 P.2d 439 (1967); *Wilson v. United States*, 350 F.2d 901 (10th Cir. 1965). This is the general rule. 5 Nichols on Eminent Domain, § 18.5 (3rd ed. 1981). The narrative which follows is an abstract of the testimony and evidence produced. Parts, where noted, will be omitted during this phase of the opinion but will be later picked up during the discussion and disposition of the issues.

### GRIEVES LAND

The easement across the Grieves land is over existing roadways for 13,621 lineal feet (about 2.4 miles) used previous to the date of taking by Coronado and about four other oil companies as well as the Grieves in their ranching operation. The road has been there since 1950 when first built by the ELK Company. A new road has been or will be built by Coronado for a distance of 340 feet on the Grieves property.

Grieves testified that the road goes through where they put baby calves in the spring and cows to finish calving. For summer pasture, cows have to cross the road to get to water. Grieves indicated that they

use up energy, causing weight loss, because when traffic is on the road they will turn around and go back. Besides, cows get hurt by trucks and die. In the winter the traffic scares them away from the draw where they are being fed. Dehorned cattle frightened by traffic can get up, run and bleed to death.

Another problem arises because horses are bothered by the dust. Dust gets on the hay and it will not grow. The dusty hay cannot be fed to horses. Animals get sick from dust and have eye problems from irritation.

There is a loss of carrying capacity because cattle won't graze near a road. Grieves described an occasion when a truck because of its length could not get off the county road through the cattle guard so it went through his pasture and damaged the fence. He claimed such occurrences are common. He also related how two Coronado trucks got off the road and had gotten stuck.

Sightseers have been known to come on the ranch to watch drilling operations, then talk about it at the Tavern. One time a photographer came onto his land and was taking a picture of a broken down wagon. There is noise twenty-four hours a day. Grieves' life style is disrupted by the activity.

Coronado objected to the admission of Exhibit L, a letter contract between Grieves and Western Production as to one well, which provided an initial payment of $1,920, an additional $1,920 when a well went into production, and another $768 per year thereafter based on the number of rods. The objection claimed that this evidence was not pertinent to a before-and-after valuation. Grieves had some sort of an oral agreement with Western that he would receive a "1% carried working interest," if available, for each additional well; otherwise, the same agreement was to prevail as to all other wells.

From M & K, another oil company, Grieves received $1,000 for the first well, but that company elevated the road to his house and plowed snow for that winter.

For the second well, Grieves had a "1% carried working interest." He claims to receive about $60.00 per month per well under some sort of understanding not in writing. Grieves stated he did a lot of things verbally.

In his testimony Mr. Grieves, based upon information he had, projected that the leased acreage of appellant was such that on the basis of 40-acre spacing, appellant would have 30 wells to drill and service. He figured the traffic by the number of trucks necessary for the several operations involved in drilling, servicing, hauling of oil, visits by salesmen and investors, etc., and assumed 20 to 30 years for the life of the wells. He noted that the traffic kicked up dust which settled on his lands adjacent to the road. However, it should also be noted that he acknowledged there was already dust from the county graveled road adjoining his lands by which the condemned road was approached.

Grieves figured he would be damaged $5,000 per year for thirty years—$150,000 by Coronado alone because of its multiplication of an existing problem. His testimony in this regard will be later covered in greater detail.

Grieves did not know how many cattle he had on the ranch between 1971 and 1979 but estimated the current number at around 500. He could not remember how much he paid for part of the ranch bought two or three years previous nor how many acres he acquired but he did eventually remember it to have been a sale from his brother under an agreement that his brother would get half of anything over the price that he paid for it. The price was $38.00 per acre.

The district engineer for the State Department of Environmental Quality testified on behalf of the Grieves. On the basis of information supplied by Grieves he estimated, based upon a six-day time period, that during the drilling of one well, the traffic would cause 11.3 tons of dust to fall on the ground, and 5.3 tons would remain suspended in the air. During a typical day

after production was underway, and calculated for a 2.5-mile road, 585 pounds of dust would settle and 275 pounds would be suspended. No actual monitoring by instruments of air was conducted nor was there evidence of the acreage affected. In his official capacity he had received only one complaint about oil field activity in the past six and one half years in the five-county area he worked. During that time there were no complaints about cattle dying from dust generated on roads leading to oil fields.

A banker-rancher testified that oil field traffic over a county road affected his horse ranching business. He had a small place so horses were unable to get away from it. His meadow had not been used since the county put sand on the road which created blowing dust. He had one colt come down with dust pneumonia. He testified that dust had so diminished the value of his ranch that he was selling it. Five years previous he paid $150 an acre and added $150,000 in improvements and was asking at the time of this trial $300 an acre.

An employee of the United States Department of Agriculture, veterinarian-rancher-farmer, testified that dust can make horses and cattle ill. Teeth are worn down eating dusty grass; horses cannot pass dirt, though cows can; eye problems develop in cattle; and weight gain can be affected.

Another rancher testified he had a ranch similar to that of Grieves with oil traffic passing through. He lost some calves due to dust and had to move other cattle away from the road. He expressed an opinion that the value of ranch real estate was diminished by the presence of oil field traffic but did not know how much. He told of an experience where oil traffic had gotten off the road because of its unimproved condition causing it to bypass onto the property adjacent to the road. He testified that cattle will follow a pickup, thinking it carries feed. He thought that the road on his ranch, because of the nuisance, substantially detracted from the value of the ranch so that he could not sell even if he wanted to.

This witness also testified as to the Reisland ranch substantially to the same effect except that it involved sheep which were there. He opined that weight gain in both cattle and sheep is affected by the traffic. He could, however, produce no evidence of ranches selling for less because of an oil activity road going across it. He had no problem with the oil operator going across his ranch and had a pleasant relationship with the company. He just moved his cattle around to accommodate the road.

A pumper for Western Production testified that he traveled the two-and-one-half mile stretch of road. He allowed that he was aware of a truck getting off the road and going through a fence. This was objected to as a trespass, not evidence of value. The objection was overruled. He had noticed dust in "barrow ditches," cows and calves darting across roads in front of vehicles, and rough necks speeding when changing shifts, three times a day each way (six trips). However, he saw the dust only while drilling was going on. Grieves never complained to him about the dust making his cattle sick nor had anyone ever complained to him about the dust causing problems with cattle in the area.

A water truck driver for Western Production, testified he had observed a lot of dust during drilling. Traffic had to go slow because of cattle on the road. Most heavy traffic went ten or twenty miles an hour and were mindful of the cattle. His experience was entirely with the others using the road prior to Coronado's possession, that is to say with Western Production, M & K and Townsend. He was never made aware of any complaints about the dust or cattle becoming sick.

The wife of Jack Grieves, testified that as a result of oil operations, there were lots more people, dust, just plain hassle, people lost, looking for their rigs. She objected to the personal inconvenience caused by dust settling on clothing and laundry hung on the clothesline. This was objected to by Coronado on the basis that personal inconvenience is not compensable. The objection was overruled. Her testimony was from

experience with the vehicles of Western Production, M & K and Townsend. Reislands' son worked for Western Production.

## REISLAND LAND

Reisland testified that his ranch adjoined Grieves. There were six oil wells on the ranch when he bought it. He had no mineral rights. Other oil companies drilling and servicing wells on his ranch were Western Production, Toco, Townsend, North Finn, Columbine, Osborne and Coronado. Three operated on the area of his summer pasture: Coronado, Townsend and Western Production. Other oil companies compensated him for road use under some type of agreement. He thought there were 30 potential well locations in his summer pasture area and 5 in his calving pasture.

He claimed he had a 10% loss (20 lbs.) on calf weight from calves not going to "creep" feeders on account of the traffic. He asserted that there was a loss of grass because cattle would not go near the roads. He figured he had lost $2,736 the previous year (80¢ lb.—171 calves).

Coronado had 3 wells on his place at the time of trial and expected the problem to increase as more wells were drilled. He indicated that he had no money to buy more pasture. He thought he would have to cut his herd 10%—which would cause a loss of $8,500. He claimed an added expense of $9,400 to check fences, roads, and gates a year ($15 a day). He had a cow get into a thread protector (a metal cap which goes over the threads of oil well pipe during transit and before installation) left by some driller.

He had problems with oil field guys with dogs getting into sheep in that dogs and sheep do not mix; lambs run after pickups; and when he loses a ewe, that is $60.00. He planned on going out of the sheep business which made him $7,397 for wool and lambs.

When a dog chases a calf, other calves gather to see what's going on with the result that they get mismothered. In addition, a dog makes cows have to go an extra mile for water, causing weight loss.

Mr. Reisland opined that Coronado was responsible for 50% of the loss in value of his ranch in the amount of $87,600. The details as to how he reached these figures will be later covered.

On cross-examination it was developed that in 1975 Reisland bought the ranch for $35 an acre. He allowed three other oil companies to use the roads beginning in September, 1980. The drilling actually took place on federal leases. He also indicated that he had 140 sheep every year since oil activity started. He did not know whether Coronado had any dogs. He never called in a veterinarian to examine into any loss of livestock due to dust. Further, he made no claims against any oil companies for loss of any animals due to dust.

A rancher testified to the effects of traffic during drilling. He noted that there was not much of a problem when production was in, except for cows getting tangled up in guy wires and pump jacks; however, during drilling, he indicated a real bad dust problem frequently developed. He had lost calves at weaning, they got sore eyes and lost weight. There was a loss of grazing area from dust collecting on the grass. He estimated the oil activity resulted in a 200 pound loss of weight per animal. He claimed ranches with roads used by oil operators were worth less but he did not know how much less.

He also testified to an incident when dogs from a driller's rig got into his sheep and killed three of them. He told of a fence that was torn out. He related how cows get their feet caught in thread protectors used on oil well pipe, found all over after drilling.

Another rancher testified how oil operations have a disruptive effect on ranching operations: dust, pneumonia, pink eye in calves; air horns on trucks scaring cattle; cattle killed and crippled; dust on grass; cattle guards filled with mud; gates left open and hunters using roads without permission. He also mentioned the danger from thread protectors. His conclusion was that the presence of a road has affected the value of his ranch "quite a bit."

On cross-examination it developed that 15 oil companies were using his roads. He agreed that the "highest and best use" of land was both ranching and oil. This witness was a county commissioner who voted against granting Coronado a private way. He thought ranch property was decreased in value 5% to 7% by the presence of roads servicing oil drilling and operations.

A veterinarian testified about dust pneumonia, common in Weston County, the dangers of physical injury by being struck by machinery, and that cattle drink oil and become sick. None of the ranchers who testified had ever called this veterinarian to treat the problems he described.

Counsel for Coronado repeatedly objected to the admission and moved to strike such testimony as that just summarized. He was consistently overruled. There appears no waiver of any objection to admissibility.

Dale W. Harris, Torrington, in the real estate business, testified as an expert appraiser for both Grieves and Reisland. He stated the purpose of the appraisal was to determine the before-and-after value of each of the ranches. He checked to determine if there were any sales of similar ranches and the nearest was 20 miles northwest of Newcastle. He testified that Grieves was damaged in the sum of $69,000 and Reisland in the sum of $86,000. We will later cover this appraisal in more detail.

On cross-examination it was developed he had taken no formal training in real estate appraisal, only at the school of "hard knocks" and had used only one comparable sale for his before value.

Coronado moved to strike the testimony of Harris on basis that the factors considered were improper, but was overruled.

## EVIDENCE—CORONADO

The president of Coronado Oil testified that his company had only pickups used by foremen, superintendents and pumpers. Independent contractors carry on all drilling of oil wells. Coronado had only two employees who traveled to lease areas. Heavy vehicles used by contractors cannot go over 20 m.p.h. It intended to drill one well per 80 acres as a matter of economy, though he did not question the right to drill on every 40 acres. Wells being drilled were only expected to produce 7 barrels per day.

Another witness for Coronado testified that he was in the dirt construction, ranching and oil business in various aspects. He had oil operations crossing his 7,000-acre ranch. He had been in the cattle ranching business for the past twenty-five years with the oil operations referred to taking place over the last ten years. He was also familiar with other cattle ranches in the area. He had never heard of a cow dying from dust; nor that cattle go "chasing a damn pickup all day."

Dwight D. Reed, an appraiser and university graduate with a background of several courses for appraisers completed and who belonged to the American Association of Certified Appraisers—a branch of the National Board of Realtors—testified as an expert for Coronado. It came out that he had been a real estate broker for thirty-three years and a real estate appraiser for the past twenty-five years. He defined fair market value, determined the highest and best use of the lands in question to be that of livestock grazing and oil production, and he used the comparable sales with a market data approach as the method of arriving at fair market value of the interest in land taken. He looked for comparable sales for determining the value before as well as comparables for determining values after the taking. He investigated 20 sales, 13 of which he did not use for one reason or another, 7 of which he did document and use, all within 11 to 15 miles from the subject properties. A map of comparable sales, Coronado's Exh. 3, was received in evidence for illustrative purposes.

Comparables 1 and 2 had many oil operator roads running through them. Comparable 3 had no oil operator roads. Sale 3 was completely out of the influence of oil production and it sold for the same as one with oil production. The witness came up with a market value figure of $1,249.00 for the taking of the easement across the Grieves

property and a market value figure of $1,940.00 for taking of the easement across the Reisland property. These figures represented around $128.00 market value per acre for the grazing area ground actually occupied by the road. Mr. Reed found no lessened value (severance damage) of the ranch because of the road. The following then transpired:

"THE COURT: Do you have a motion about the testimony, counsel?

(At which time counsel for the defendant's conferred.)

"MR. MATTSON: Well, Your Honor, I would move to strike the testimony for the reason that it does not, is not according to the rule of the fair market value of the property or of the entire unit before and after the taking.

"THE COURT: Do you want to respond to the motion?

"MR. MONTANO: Well, Your Honor, as I read the Continental Pipeline case and the Basin Electric Power Corporation case, that is precisely the rule that the court said that we had to follow—was the difference in the before and after.

"THE COURT: Okay. Motion is granted. The entire testimony of the witness is striken. The jury is instructed to disregard it.

"MR. MONTANO: Well, Your Honor, may I have leave then to go back and ask him about it? Apparently, you want a breakdown of some of these figures? I don't understand the grounds. I would like leave to go back and ask him some more questions.

"THE COURT: You have been on direct, counsel.

"MR. MONTANO: Well, I would like to make an argument out of the presence of the jury, Your Honor.

"THE COURT: All right."

Counsel for Coronado made a valiant effort to point out the precedent established by this court with the following result:

"THE COURT: Well, counsel, let me tell you. You look at those figures. That's ridiculous. That shocks the conscience of the court, to come up with those kinds of figures.

"MR. MONTANO: Well, I think the function of the court—

"THE COURT: Don't tell me what the function of the court is. I'll tell you what the function of the court is and that's to provide for justice and equity of things that happen in this courtroom. And that is not just. There is no showing as to how he arrived at that before figure or as to the after figures. He just puts them, put some figures up there.

"MR. MONTANO: Well, without—I don't want to argue with the court and I am trying with all due respect but I have got to respect my client.

"THE COURT: Certainly you do.

"MR. MONTANO: The function of this jury is to determine the amount. It is not for the court to make a determination, with all due respect for Your Honor.

"THE COURT: You bet it is when it is that shocking, counsel.

"MR. MONTANO: Well, I think—

"THE COURT: I'll take it away from the jury in a minute when that happens.

"MR. MONTANO: I don't mean to argue, but in order to state my grounds, I feel that this court is usurping the function of the jury because it is the function of the jury to make the determination of just compensation.

"THE COURT: Well, there's no basis to arrive at those ridiculous figures.

"So, the ruling will stand.

"MR. MONTANO: Then I would like to make a motion that I be given leave to examine the witness some more to try and lay the foundation, which apparently the court feels is necessary and which I never heard as being the foundation for counsel's motion to strike. I never heard a foundation from them. They never gave the reasons as to why they moved to strike. They just said, 'We move to strike because it doesn't conform,' I believe they said, 'to the rules.'

"THE COURT: Well, you have had your opportunity to present it and the motion will be denied.

"MR. MONTANO: Your Honor, I want to make another motion at this time. I feel that I should move for a mistrial because I think as a result of the turn of events it is very unjust to my client to have this situation happen and if we are here to see justice, I think a motion for a mistrial ought to be granted. I so move.

"THE COURT: Motion is denied.

"Somebody have the jury brought back in."

In this state of disarray, the appellant was left with no useful testimony because it had no other witnesses, and appellees had nothing to rebut. The court moved on to an instruction conference with counsel. The following morning, the court reversed its ruling that the testimony of appellant's witness and exhibits be excluded. Both Coronado, concerned with error, and counsel for Grieves, confronted with Mr. Reed's departure after the court's ruling striking the testimony and unavailability for cross-examination, were left uneasy. All objections were overruled and the trial court went ahead to instruct the jury, including advice they could consider Mr. Reed's testimony. Then, counsel made closing arguments.

█ The only purpose of the trial was to determine "due compensation"[1] or "just compensation"[2] for the taking of an interest in the land of its owners. In the trial of an action such as this, it sometimes appears that there are two standards of just compensation—one for the condemnor to pay and one for the owner to receive. The great divergence of testimony in this case suggests such a distinction. However, there can be only one standard. The constitutional language suggests that it is not compensation to be paid for a personal loss to the owner, but it is to be paid for the property taken or damaged. Illustrative of this concept is *State Highway Commission v. Scrivner*, Wyo., 641 P.2d 733 (decided 2/26/82) citing *Morrison v. Cottonwood Development Co.*, 38 Wyo. 190, 266 P. 117 (1928) where it was held that injury to a business conducted on lands taken does not constitute an element of just compensation. See also, *Sheridan Drive-In Theatre, Inc. v. State*, Wyo., 384 P.2d 597, 599 (1963), holding that the damage for compensation to be made is a damage to the property itself; the property must suffer some diminution in substance or be rendered intrinsically less valuable. See also *State Highway Commission v. Newton*, Wyo., 395 P.2d 606 (1964) to the same effect. This concept is well explained in *Monongahela Navigation Company v. United States*, 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463, 468 (1893):

" * * * The noun 'compensation,' standing by itself, carries the idea of an equivalent. Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages, the former being the equivalent for the injury done, and the latter imposed by way of punishment. So that if the adjective 'just' had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken. And this just compensation, it will be noticed, is for the property, and not to the owner. * * * "[3]

"Private property shall not be taken or damaged for public or private use without just compensation."

1. Art. 1, § 32, Wyoming Constitution:
 "Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation."

2. Art. 1, § 33, Wyoming Constitution:

3. This was a construction of the pertinent clause of the Fifth Amendment to the Constitution of the United States:
 "[N]or shall private property be taken for public use, without just compensation."
 Compare with Wyoming Constitution. The slight difference in language does not take

■ Just compensation for property taken by condemnation has been defined as "an equivalent in money for all property taken." Wyoming *State Highway Commission v. Scrivner*, supra; *Wyoming Railway Company v. Leiter*, 25 Wyo. 286, 290, 169 P. 1, 2 (1917). It is the value of property at the time acquired and that means full value; regardless of how such value is reached, it must be fair to the condemnor as well as the owner of the property taken. This has been expressed in judicial declarations that the compensation paid should be the "market value," or sometimes stated, the "fair market value," "cash market value," "fair cash market value," or "reasonable cash market value." Regardless of the label, embellished one way or the other, market value seems to be the most frequently applied tool to reach just compensation. 4 Nichols on Eminent Domain, § 12.1 3rd ed. 1981. The manner of determining just compensation is a judicial function and must be determined by the courts (unless the parties agree upon a bargain and sale basis) in a due process of law proceeding. *United States v. 2902 Acres of Land in Natrona County*, 49 F.Supp. 595 (Wyo. 1943); 4 Nichols on Eminent Domain, § 12.1[3], pp. 12–46 through 12–49.[4]

## I

■ Coronado asserts that the admission of opinions of just compensation which were not tied to a "before and after" valuation of the property and based on speculation and conjecture constitutes reversible error. We agree. In *Continental Pipe Line Company v. Irwin Livestock Company*, Wyo., 625 P.2d 214 (1981), this court declared:

"We have held that where there is a partial taking of property, as here, which will result in damages to the remainder not taken, the amount of just compensation to be awarded for that 'taken or

away the idea. See also, *State Highway Commission v. Scrivner*, supra.

4. None of the parties claim that the Wyoming Eminent Domain Act is applicable. Section 1-26–501, et seq., W.S.1977 (Ch. 174, S.L.Wyo. 1981), effective July 1, 1981. This case was

affected' is determined by application of the 'before and after' rule, i.e. just compensation is the difference between the fair market value of the entire parcel before the taking and that after the taking. *City of Rawlins v. Jungquist*, 16 Wyo. 403, 94 P. 464, 468, 96 P. 144 (1908); *Gillespie v. Board of Com'rs of Albany County*, 47 Wyo. 1, 30 P.2d 797, 803 (1934); *Colorado Interstate Gas Company v. Uinta Development Company*, Wyo., 364 P.2d 655, 658 (1961); *Wyoming State Highway Department v. Napolitano*, Wyo., 578 P.2d 1342, 1346 (1978). See 4A Nichols on Eminent Domain § 14.232 (1979); Orgel on Valuation under Eminent Domain § 64 (1953)." 625 P.2d at 216.

In *Canyon View Ranch v. Basin Electric Power Corporation*, Wyo., 628 P.2d 530 (1981), this court concluded that in the taking of an easement by condemnation the district court should instruct the jury that the measure of damages is the difference in value of the whole tract prior to imposition of the easement and the value of the tract after imposition of the easement. This court then approved a form of instruction relating to factors to be considered:

" 'In determining the reduction, if any, in the fair market value of each defendant's lands, you may consider all factors which you find to have an effect on fair market value. However, any factors which you consider must be direct and certain and may not be remote, imaginary, or speculative.

" 'In determining damages, if any, to each defendant's remaining land, you may consider every lawful use the Plaintiff may make of the land condemned, and you may consider every element of damage affecting the fair market value of the remaining lands resulting from construction, operation, inspection, main-

originally filed prior to 1979 and tried on June 10, 11 and 12, 1981. The record furnished the court has no entries except those made after remand as a consequence of the first appeal to this court. A date of January 4, 1979 for a hearing is found in 603 P.2d 406, supra.

tenance and the presence of the [easement].' " 628 P.2d at 534.

See also, *State Highway Commission v. Scrivner,* supra.

The trial judge in the case now before us gave instructions to the jury within the parameter of the before-and-after approach to fair market value which this court has approved. The difficulty in this case is not with the general instructions of the court with before-and-after values, but the evidence it permitted the landowners to present to the jury, which was nothing more than a conglomeration of improper pure speculation and guesswork and was not direct and certain as to fair market value.

The court instructed the jury as to fair market value:

> "You are instructed that 'Fair Market Value' as used in these instructions is that amount which would be paid under normal circumstances on the free and open market, in the usual course of dealings, by a willing buyer not forced to buy and which amount would be acceptable to a willing seller not forced to sell. * * * "

We cannot find that this court has defined fair market value in those terms, but the instruction given by the trial judge does fit what has been generally judicially approved. This is the "willing seller-willing buyer" test, stated a little bit differently in 4 Nichols on Eminent Domain § 12.2[1]:

> "By 'fair market value' is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses for which the land was suited and might in reason be applied. * * * "

It appears from the record that the testimony upon which the jury relied was that of the owners and not that of their professional appraiser, which also was not based on fair market value as defined. An analysis of the testimony of both the owners and their appraiser discloses that the standard of value used by them was not the fair market value but the value to them personally.

While an owner may testify as to the value of his property, *Sagebrush Development, Inc. v. Moehrke,* Wyo., 604 P.2d 198 (1979), that in itself does not make it competent, *Wilcox v. Herbst,* 75 Wyo. 289, 295 P.2d 755 (1956); *Commonwealth, Department of Highways v. Fister,* Ky.App., 373 S.W.2d 720 (1963). This is consistent with the rule generally prevailing in condemnation actions. An owner is only qualified to express an opinion of value in a reasonable way and in accordance with the proper standards for determining fair market value.

What the property is worth to an owner is not a correct basis for an opinion. *Utah State Road Commission v. Johnson,* Utah, 550 P.2d 216 (1976); *State, ex rel. State Highway Department v. J. H. Wilkerson & Son, Inc.,* Del.Super., 280 A.2d 700 (1971); *United States v. Petty Motor Co.,* 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946). The opinion of an owner who had determined a value upon an improper test has no probative value in an eminent domain case. *Denver Urban Renewal Authority v. Hayutin,* 40 Colo.App. 559, 583 P.2d 296 (1978), cert. granted but dismissed; *State v. Larson,* 54 Wash.2d 86, 338 P.2d 135 (1959). The price fixed by a reluctant owner, not a willing seller, hardly meets the test for evidence of market value which requires a willing seller. *Arkansas State Highway Commission v. Stallings,* 248 Ark. 1207, 455 S.W.2d 874 (1970).

In the case before us, Grieves testified that the before valuation estimate made by his appraiser was "in the ballpark." But he then admitted that he did not know what the after value was. He calculated he was damaged $5,000 per year for thirty years—$150,000 by Coronado alone, based on $175.00 per well per year for thirty wells. When he was asked if he reached that from a before figure, he said no, he did not know what the value was: "I figured what the trouble was to me"; "I'm not an expert in that." He again testified that the $150,000 difference would be the value "to me." Appellant's motion to strike Grieves' testimony

in that regard was denied. The Grieves testimony was clearly not based on any valid fair market value basis but upon value to him, which is an improper basis. It is safe to say that one who disclaims any knowledge of market value should not be permitted to testify in that regard.

The testimony of Reisland was similar to that of Grieves in that there were related problems encountered with the presence of oil operators on the property interfering with cattle and sheep ranching. He, without any fair market value basis, attributed 40% of his ranching problems to Coronado, and then indicated the figure would increase in the future. He estimated his ranch had been worth before the new road—the date of taking—to be $876,000. He based that value on the $150.00 per acre that the Cummings ranch sold for (the comparable sale testified to by the owners' appraiser). When asked if he had an opinion of the decrease in value because of the road use by Coronado, he said he would not want the ranch at all. He, therefore, would be a reluctant buyer—not a willing buyer. The question was then asked: "Do you have an opinion as to how much it's decreased its *value to you*, sir?" (Emphasis added.) Answer: "I would say $30 an acre." This gave him an after value of $120.00 per acre or $600,800.00. All this was clearly only a decrease in value to him and bore no relationship to market value.

■ Both owners were improperly permitted to testify and produce evidence to the loss of livestock business due to the road. Loss of business is not a proper factor in reaching fair market value and is not compensable. As expressed in *Gillespie v. Board of Com'rs of Albany County*, 47 Wyo. 1, 30 P.2d 797 (1934), where a cattle operation was involved, injury to a business conducted on the land is not an element of just compensation, citing *Morrison v. Cottonwood Development Company*, supra, in that market value is more or less interwoven with its value for use in business after and

as a result of the partial taking. Since those cases, this court has reiterated the rule in *State Highway Commission v. Scrivner*, supra, *State Highway Commission v. Peters*, Wyo., 416 P.2d 390 (1966), and *Sheridan Drive-In Theatre, Inc. v. State*, supra. Where the element of personal loss is interjected, prejudicial elements distort the real market value as found in the market place.

The appraiser for both the Grieves and Reisland ranches found but one comparable sale in his quest to build a comparable sales market data approach. From that he arrived at a value of $131.00 an acre from the sales price of the comparable, after deducting the value of improvements. He then compared it to the Grieves property and reduced the before value of the Grieves property to $89.96 per acre because of the 48 oil wells already located on or already being serviced over roads located on the Grieves property. He came up with a total before value of $986,000.

For an after value, he reduced the Grieves property by 7% to a value of $83.55 per acre for a total after value of $917,000, making a difference of $69,000. The reason he reduced the value was because of the additional traffic to be created by the oil operations contemplated by Coronado. He did not use the comparable sales approach to arrive at his after value. He used only his judgment. He did not use other sales made in the area about which he did not learn in order to determine their usefulness in valuation. In order to reach the value of the land occupied by the condemned road—the area over which the easement passed—he used a figure of $5.00 per rod which figure was supplied to him by Grieves and Reisland who had informed him that it represented what they were getting. On the Grieves ranch, he calculated that there were 888.54 rods occupying 9.61 acres which rounds off to $4,442.00 or $462.00 per acre. This estimate was just for the right to use a road already being used by four other oil companies.[5] He further testified that the

---

5. He testified to the same effect as to the Reisland property. There were 1,312.12 rods of road, occupying 14.92 acres, having a value of $6,560 arrived at by computing its value at $5.00 per rod.

rest of the $69,000 for the Grieves property was attributed to dust, sightseers, hunters, poachers, dogs, noise, and inconvenience. He also had some idea that someone would come along and shoot out a water tank, with the result that the livestock would go thirsty and lose weight.

He followed the same procedure and theory in reaching a figure of $86,000 for the Reisland property. He reduced his before value, however, by 15% to reach an after value of the Reisland land.

The after valuation determined by the appraiser found its basis in the loss to the owners. Since owners' personal losses were incompetent, so were the appraisers' estimates based upon those losses. But even more serious, the basis for damage to the remainder is not founded on market value. Coronado moved to strike the evidence of the landowners' expert on the ground that his opinion was based upon improper factors. The objection was improperly overruled.

Though pressed to do so, the expert witness failed to relate his opinion to fair market value from the market for an after-taking valuation. He plucked from the air the 7% figure for reduction in value of the Grieves property and 15% for the Reisland property value, but why 7% or 15% could not be disclosed. It was an arbitrary guess. It had no basis. It had no rational or factual foundation. The testimony in this case by the appraiser for the owners was the same sort condemned in *Walters v. State Road Department*, Fla.App., 239 So.2d 878 (1970) where the expert witness used no accepted standard or formula for a percentage adjustment but arrived at a value as "a matter of adjustment on the part of the appraiser." The Florida court held that such an adjustment was purely subjective and should have been stricken. In the case before us, the appraiser testified that in arriving at his after value, "I used my best judgment." He said he did not need any

comparable sales in order to arrive at a fair market value of the remainder (severance damage). It is obvious that by computing the value of the easement in rods, he was coming up with a value for the land occupied by the road easement itself several times more per acre than the fee value per acre.[6] This court pointed out in *Continental Pipe Line*, supra, that such a method of mixing up rods and acres leads to speculation and conjecture.

The mere opinion of a witness unfortified by any data as to market value must be regarded as too uncertain and conjectural to form a proper basis for a reasonable estimation of value. The expert's opinion here was no more than an uninformed guess—a shot in the dark—a personal view. It is proper to strike the testimony of a witness in a condemnation case whose conclusion as to market value is based upon personal views and not upon adequate knowledge of market values in the locality. *City of Houston v. Fisher*, Tex.Civ.App., 322 S.W.2d 297 (1959). While this court has taken a liberal view in the matter of foundation for opinion evidence of values, a lack of completeness in the investigation or reliance on irrelevant factors may serve as grounds for holding there is inadequate foundation to qualify an expert's opinion. *State Highway Commission v. Newton*, supra, 395 P.2d 606. We must draw the line somewhere. As said in that case, the usual expert is qualified by showing his familiarity with property and with other property in the neighborhood, his experience in the business, *his familiarity with the state of the market, and of sales of similar property in the vicinity*. Here, the expert witness displayed an ignorance of the state of the market and of sales of similar property in the vicinity. Market value is the result sought.

As has been said in 5 Nichols on Eminent Domain, § 18.42, pp. 18–221 through 18–222:

---

6. There was no evidence that the fair market value of land actually occupied and used as a road was more than its value as grazing land. The two elements of compensation to be determined in a partial taking are the market value

of the interest in property actually taken plus the damage to the market value of the property not taken resulting from the partial taking. *Stringer v. Board of County Commissioners of Big Horn County*, Wyo., 347 P.2d 197 (1959).

"Furthermore, a witness must base his opinion upon market value, and market value alone. Witnesses who are not familiar with market values, or who insist on applying some other test of value than that which the courts have agreed upon as the proper one, should be excluded from the stand. * * * "

All of the witnesses for the owners who opined a value only mouthed the before-and-after rule and test of market value but did not apply either, except in a pseudo fashion. The opinions were what have been referred to as ipse dixit.[7]

In *Nasco, Inc. v. Director of Public Works,* 116 R.I. 712, 360 A.2d 871 (1976), the court considered worthless the testimony of an expert who, when pressed on cross-examination, described his value figure as the product of his "own brain computer." Conceding that his conclusion might be resting on his experience, the court pointed out that the witness might have supported his opinion by use of sales of comparable properties.

In the case before us, considerable evidence was presented which counsel for the owners characterized as conditions which affect the value of property and which would influence buyers, such as dust, noise, the presence of traffic, the probability of trespassers, oil operators leaving thread protectors laying around, the annoyance of persons looking for a drilling or oil operator's crew, the possibility of someone shooting a hole in a water tank and causing cattle to go thirsty, and workers bringing in dogs that annoy and even kill sheep. While these imaginative detriments arising from the presence of a road may affect buyers, they must be tied to market value. The court in *Sacramento and San Joaquin Drainage District v. Reed,* 215 Cal.App.2d 60, 29 Cal.Rptr. 847 (1963), modified only as to costs, 217 Cal.App.2d 611, 31 Cal.Rptr. 754 (1963), took a jaundiced view of an approach which permitted a valuation witness to state as a "reason" for his opinion one which the witness might choose to attribute to a prospective purchaser, so long as the detriment in some instances arises from the project. The court said:

" * * * The approach ignores the fact that the 'prospective purchaser' is an abstraction, a ventriloquist's dummy who speaks only with the voice of the flesh-and-blood valuation witness. In feeding words to the fictional buyer, the witness—be he appraiser or landowner—is confined only by his own imagination and by such narrower limits as the law may impose on him. A condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner. (See Kratovil and Harrison, Eminent Domain—Policy and Concept, 42 Cal.L.Rev. 596, 626.) There is a limit to imaginative claims even when described in terms of a prospective buyer's mental reactions. To say that only the witness' valuation opinion has probative value, that his 'reasons' have none, ignores reality. His reasons may influence the verdict more than his figures. To say that all objections to his reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts. [Citations.]" 29 Cal.Rptr. at 853–854.

It is fundamental that an owner's burden to prove the nature and amount of his damages in money cannot be sustained by evidence which is speculative and conjectural. Expert testimony should not be received if it appears a witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess. An expert should not be allowed to express an opinion as to fair market value on an inadequate basis; and, if without a sound and reasonable basis, it should be stricken.

7. Ipse dixit is defined in Black's Law Dictionary (5th Ed. 1979) as "a bare assertion resting on the authority of an individual." See *State Highway Commission v. Biastoch Meats, Inc.,* 145 Mont. 261, 400 P.2d 274 (1965) where the expression is used and ipse dixit opinions disapproved. There was some proper valuation testimony in that case.

Clearwater Corporation v. City of Lincoln, 202 Neb. 796, 277 N.W.2d 236 (1979). See also Northern Natural Gas Company v. Beech Aircraft Corporation, 202 Neb. 300, 275 N.W.2d 77 (1979).

## II

■ There is some overlap between the issues presented. Coronado's issue "II" poses a question related to the one just discussed, the matter of factors to be considered in evaluating real estate for condemnation purposes. Coronado asserts that it was prejudicial error to allow the jury to consider testimony regarding trespass and other tortious acts by third parties. It has reference to the evidence presented by the landowners that oil and other trucks had, in the past, trespassed off the limits of the right-of-way, that hunters and sightseers had come onto the ranches, that fences were broken, that dogs belonging to third parties had chased, injured and killed sheep, that livestock got caught in thread protectors and that cattle had been negligently killed by vehicles or machinery. Coronado vigorously objected throughout the trial to such testimony and argued that the clear intent of this testimony was to invite the jury to assess damages based on tort or negligent use of the easement and not to assess fair market value of the taking, the real issue. We agree that it was error.

Not every injury to property is covered by the constitutional guarantee that private property shall not be taken or damaged for public or private use without just compensation. In Chavez v. City of Laramie, Wyo., 389 P.2d 23 (1964) when damaged plaintiffs attempted by a creative effort to avoid the then-existent doctrine of governmental immunity, they initiated an inverse condemnation action against the city claiming the taking of private property without payment of just compensation. The damages allegedly arose as a result of the negligence of the city causing the plaintiffs' sewer line to be crushed in connection with construction of a new viaduct. This court announced the applicable rule in condemnation actions: recovery of damages for negli-

gence may not be had in a condemnation action. The property owner is relegated to a common-law action for damages. This court affirmed that rule in State Highway Commission v. Laird, supra, 426 P.2d 439, 441, when it declared that a condemnation award may not include such damages as may arise from negligent use of the condemned property.

We believe the same rule should extend to claimed future trespass damages. Gillespie v. Board of County Com'rs of Albany County, supra, 47 Wyo. at 21, 30 P.2d at 803. We approve the rule enunciated in 4A Nichols on Eminent Domain (3rd ed. 1981) § 14.16[2], p. 14–379:

"Trespass upon the remainder area is likewise not to be considered in the assessment of damage in a partial-taking case, and this is true whether the trespass is a matter of past history or future possibility."

By the same token, an injury to persons or property which may possibly occur in the future by reason of the condemnation or operation of the project is generally rejected as an element of damage on the ground that it is too remote or speculative to merit consideration. Nichols, supra, § 14.17, p. 14–384.

■ Much of what the owners claim falls within a classification which is based on unfounded fears of potential danger. The most hallucinative of such fears came from the owners' expert, who asserted that the presence of the road was an invitation to some crackpot trespasser to come upon the land, shoot a hole in a water tank and thereby cause the livestock to go thirsty. Fear of a remote and contingent injury which may occur, but the happening of which is altogether speculative and uncertain, is not regarded by the law as an element entering into the damage which may be allowed an owner. 4A Nichols on Eminent Domain, supra, § 14.09[1].

The use of such evidence in this case is particularly aggravated by the fact that the alleged trespasses and torts past and future are not those of Coronado but by unidentified persons. The evidence is that the road

across the Grieves property was already in existence being used by at least three other oil companies and, on the Reisland property, some six other oil companies were operating on his property over other roads, all of which compounded the conjecture involved in permitting such evidence. All such evidence should have been stricken or not permitted in the first place.

### III

■ This leads to Coronado's next issue which partially embraces some of what has already been covered in a discussion of inadmissible, speculative, and conjectural damage. Practically all of the owners' witnesses bore down heavily on the dust created by oil activity, most annoying at the time of drilling but tapering off with operation of the wells when only the work of hauling away the oil and maintenance of the well pumps remained.

We are inclined to the view expressed in *Continental Pipe Line Company v. Irwin Livestock Company,* supra, where the same type of evidence was introduced. There, because of the oil operation, Irwin went out of the sheep business, as Reisland testified he is planning to do. Evidence was introduced there showing weight loss, excessive wear on the teeth of livestock, calves being separated from their mothers, cattle following vehicles—almost a rehearsal of the evidence in the case now before us. At that time this court pointed out that the problems were associated with the oil activity generally, not just road use by the condemnor oil company. It was held there that the type of evidence presented was not such as was suitable to a before-and-after valuation. The use of rods as a means of measurement was not considered appropriate. The distance on each side of the road affected by the dust was not delineated as

to whether it was 20 feet or a mile. The evidence lacked specificity there as it does here and the result can only be conjecture and speculation.

Added to that is the claim made here that the dust affected the household activities of Mrs. Grieves and lifestyles of Mr. Grieves and Mr. Reisland involving personal inconvenience, mental anguish, discomfort and annoyance. While the real issue in *Wyoming State Highway Department v. Napolitano,* Wyo., 578 P.2d 1342 (1978), reh. denied, was the timeliness of filing a claim for damages with the state auditor as a condition to prosecution of inverse condemnation litigation, this court had occasion to set out the rule with respect to personal inconvenience or discomfort of the owner or interference with the business conducted on the land. Quoting from Nichols on Eminent Domain, we said that such items are "not compensable unless such results are causative factors in the depreciation in the value of the land." With respect to the Napolitano claim, this court, there quoting from Nichols on Eminent Domain, said "[t]he depreciation in value, however, must be by reason of damage to the land itself or to property rights therein."

With the improper evidence of the after value of the land, the owners have failed in their proof that these matters of discomfort and inconvenience are causative factors diminishing the fair market value of the land. It must be constantly kept in mind that the sole purpose of the trial was to determine the market value of the land, not any damage to the owners as individuals.

### IV

Coronado's next claim of error is the admission, over objection, of an agreement between Grieves and Western Production Company.[8] The facts are not in dispute

---

8. In letter form, with an acceptance at the end, the body is in this language:

"It is agreed that Western Production Company will compensate Mr. John A. Grieves for access road damages incurred during the drilling, possible completion, and production of a well at the above referenced location as follows:

"(1) The sum of *$2.50* per rod is to be paid for the access road to the well location across Section 23–T42N–R56W (shown on the attached map) during the test drilling period. The access road is approximately *2.4* miles in length (768 rods). This initial payment is therefore *$1920.*

that the only access to the Western Production Company drilling site is across private lands, the Grieves land in this particular agreement.

The document does not represent an arms-length transaction. *City of Cheyenne v. Frangos*, Wyo., 487 P.2d 804 (1971), makes it clear that a sale that is not voluntary on both sides is not competent to establish fair market value. It must be the result of the uncontrolled bargaining of a vendor willing but not obliged to sell with a purchaser willing but not obliged to buy. Western Production had no recourse but to pay the demanded price or resort to condemnation. It was obliged to buy. That is not a willing-seller, willing-buyer atmosphere within the rule. It is an agreement reached under threat of condemnation.

There was other evidence suggesting some sort of an interest in production was paid by some oil companies. It appears that oil companies are under a compulsion to meet the landowners' demands, proceed by condemnation in the fashion selected by Coronado in this case, or not have a road. Such evidence is inadmissible to prove fair market value and is in itself prejudicial and grounds for reversal. *City of Cheyenne v. Frangos*, supra. See also, Annot., 55 A.L. R.2d 791, there cited.

It was likewise made clear in *Colorado Interstate Gas Company v. Uinta Development Company*, Wyo., 364 P.2d 655 (1961) that this court approves what appears to be the majority view that the rights of an owner to recover just compensation are not to be measured by the generosity, necessity, estimated advantage, or fear or dislike of litigation, at least where rights-of-way across another's land are nec-

essary. In *Colorado Interstate*, supra, it was the need for a pipeline easement that also created a disproportionate award.

## V

Coronado's next claim of error deals with the trial judge's inviting a motion to strike the testimony of Coronado's expert witness's testimony on the ground that it shocked the conscience of the court, then reversing its ruling after the witness was no longer available for cross-examination and failure of the trial judge to grant a mistrial. Was such irregularity prejudicial to a fair trial? We emphatically conclude that it was.

While the amount of the appraisal of Mr. Reed may have shocked the conscience of the trial judge, it was the only properly presented valuation evidence before the court and jury, as far as it went. It may have been shattered on cross-examination but that is not the point. Coronado, following the approved practice in condemnation cases of seeking to find fair market value through the use of comparable sales in the vicinity of the condemned acreage, produced an appraiser having a proper background in education, training and experience. Mr. Reed followed accepted appraisal procedures, found several comparable sales, compared and adjusted them in a good appraiser-like fashion to the Grieves and Reisland properties. He had comparable sales of lands with and without oil operators' roads and concluded that the fair market value of a road is its value for grazing, which in this case he determined to be $128.00 per acre. The road across the Grieves land occupied 9.61 acres ($128 × 9.61) with a value of

---

"(2) If the well is put on production, then you are to maintain the access road in cooperation with other users of the road. In addition, you are to pay an additional sum of *$2.50* per rod or another *$1920*. This amount is to be paid when the first load of oil is trucked from the location.

"(3) You are also to pay an annual access road fee of *$1.00* per rod or *$768* per year. This payment is to begin one year from the date that construction of the location is commenced.

"(4) In addition to the foregoing, you are to pay any damages to buildings, livestock, fences and cattleguards resulting from your activities on said lands.

"(5) This access is for the subject well, only, in the SE NW Section 23–T42N–R65W, Weston County, Wyoming.

"Once this agreement has been completed and approved, the sum of *$1920* (preceding item 1) is to be paid in cash or check before your employees or any drilling contractor retained by you, enter upon the said lands."

$1,230.08; as to the Reisland property, 14.92 acres were occupied by the road ($128.00 × 14.92) giving a value of $1,909.76. He basically determined that to be the difference between the before and after values. By rounding and making allowance for fractions, his final figure was $1,249 for the Grieves easement and $1,940 for the Reisland easement. It was his view that the value of the remaining land was not affected in the market place.

It was at this point the testimony was stricken upon invitation of the trial judge, the jury instructed to disregard, then later reinstated, the jury instructed to regard, but no opportunity for cross-examination nor redirect was available because the witness left and could not be located. The rulings of the trial judge were an abuse of discretion and prejudicial.

▮ The determination of whether an expert has sufficient knowledge of the matter in question and qualified to use his opinion is largely within the discretion of the trial judge and will not ordinarily be disturbed on appeal unless it is clearly and prejudicially erroneous and in extreme cases. *Ferris v. Myers*, Wyo., 625 P.2d 199 (1981). Here it was extremely prejudicial and erroneous. In a case such as this where on direct examination the qualifications of a witness as an expert have been demonstrated and on direct examination it is shown he has followed correct appraisal procedures, his testimony cannot suddenly and arbitrarily be stricken. It is interesting to note that the owners were willing to and did agree that the witness was qualified. Coronado, however, wanted the jury to know the outstanding qualifications of the witness, a proper choice.

The ground for moving to strike was that it "is not according to the rule of the fair market value of the property or of the entire unit before and after the taking." The reason stated was baseless in that the witness followed the exact procedures approved by this court in determining fair market value, using the before-and-after method by applying the market data approach with use of comparable sales. *Can-*

*yon View Ranch v. Basin Electric Power Corporation*, supra; *Continental Pipe Line Company v. Irwin Livestock Company*, supra; *State Highway Commission v. Newton*, supra; *State Highway Commission v. McNiff*, Wyo., 395 P.2d 29 (1964); *Colorado Interstate Gas Company v. Uinta Development Company*, supra.

The appraisers' valuation testimony was clearly admissible under the Wyoming Rules of Evidence:

Rule 702:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Rule 703:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Rule 704:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Rule 705:

"The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

While the trial judge reversed himself, the procedure was prejudicial. Though Grieves does not appeal, obviously because of the favorable verdict, he put his finger on a viable objection that he was deprived

of the right of cross-examination under Rule 705, W.R.E., supra.

 By his initial action in striking the testimony of Mr. Reed and instructing the jury to disregard, the trial judge was assuming the role of the jury. The credibility of the witness and the weight to be given his testimony was for the jury to determine and not the court. *Wisnieski v. Harms*, 188 Neb. 721, 199 N.W.2d 405 (1972). In doing so, the court practically directed a verdict for the owners which was highly improper in the face of proper evidence of a substantial nature. A verdict may only be directed when there is a total lack of evidence of probative value. *Cooper v. Teeters*, 146 Ind.App. 150, 253 N.E.2d 277 (1969). It was the function of the jury to find the evidence incredulous, if indeed it was. But certainly it was not a proper function for the trial judge.

Though the trial judge reinstated the testimony, the effect on Coronado's case must have been devastating. In the ordinary course of handling an expert witness, in all likelihood, there would have been cross-examination. Grieves' counsel objected that he was deprived of that opportunity. Cross-examination would probably have been followed by redirect. Coronado not only had its evidence mutilated by the trial judge but Coronado was deprived of the right to orderly procedure in the presentation of its case.

Coronado moved for a mistrial because of the irregularity stating, "it is very unjust to my client to have this situation happen and if we are here to see justice, I think a motion for a mistrial ought to be granted. I so move." The trial judge should have granted a new trial under Rule 59(a)(1), W.R.C.P. for "[i]rregularity in the proceedings of the court * * * or any order of the court * * * or abuse of discretion, by which the party was prevented from having a fair trial." This court has the power to remand the cause for a new trial so as to prevent failure of justice. *Masek v. Ostlund*, Wyo., 358 P.2d 100 (1960).

We conclude that there was a mistrial. It became obvious that when the trial judge apparently detected his error of striking the testimony of Coronado's witness, the witness with some justification had departed and became unavailable, through no fault of Coronado. In legal effect a mistrial is no trial at all and is declared because of some circumstance indicating that justice may not be done if the proceedings continue. *State v. Bitz*, 89 Idaho 181, 404 P.2d 628, 631 (1965). Coronado did not receive a trial conducted in accordance with the due and orderly process that should have been followed. The trial was aborted by the injustice of the procedure which ensued and resulted in no trial at all.

## VI

 The verdict of the jury exceeded the valuation testimony as to the Reisland claim even though the evidence was improper. Even if the values claimed by Reisland and his appraiser had been validly reached, the jury's verdict would have been improper. It is hornbook law that a jury's verdict in a condemnation case must be within the lower and upper range of the evidence.

The jury's verdict was $161,000 for Reisland, which was about twice what he requested. His testimony was that as a result of all oil activity, his loss was $175,200 and of that Coronado was responsible for 10 to 50 percent. At 50 percent, his claim would be $87,600.00. His appraiser gave an opinion of $86,000.

A condemnation award exceeding the amount claimed by a landowner may be set aside. *State Highway Commission v. Triangle Development Co.*, Wyo., 369 P.2d 864 (1962); *Bliss v. Board of County Commissioners of Laramie County*, 70 Wyo. 42, 244 P.2d 508 (1952). The Reisland award was flagrantly against the evidence even if the latter had been proper. A verdict unsupported by or contrary to the evidence may not stand. *Barber v. State Highway Commission*, 80 Wyo. 340, 342 P.2d 723 (1959).[9]

9. Because of massive error in the admission of evidence, this is not a situation where this

## VII

We need not consider the next issue raised by Coronado, that the cumulation of errors was so prejudicial that justice requires a new trial. Any of the errors we have enunciated would have been sufficient to require a new trial. We have, however, covered all errors asserted by Coronado because of the likelihood they might occur during the course of a new trial. *Hagar v. Mobley*, Wyo., 638 P.2d 127 (1981); *McGuire v. McGuire*, Wyo., 608 P.2d 1278 (1980); *Chicago & N.W. Ry. Co. v. City of Riverton, Fremont County*, 70 Wyo. 84, 119, 247 P.2d 660 (1952).

Reversed and remanded for a new trial.

court could modify the award as in *State High-*