No. 82-236

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

THE STATE OF MONTANA, ACTING
BY AND THROUGH THE DEPARTMENT
OF HIGHWAYS OF THE STATE OF
MONTANA,

FILED

JUN 20 1983

*Ethel M. Harrison*
CLERK OF SUPREME COURT
STATE OF MONTANA

Plaintiff and Appellant

vs.

CLINTON L. and JACQUELINE J.
HOWERY, Husband and Wife, as
Joint Tenants, and STATE BANK
& TRUST COMPANY, as Mortgagee,

Defendants and Respondents.

Appeal from: District Court of the Fifth Judicial District,
In and for the County of Beaverhead
Hon. Frank E. Blair, Judge presiding.

Counsel of Record:

For Appellant:

W. D. Hutchison argued, Helena, Montana

For Respondents:

Max Hansen argued, Dillon, Montana
Corette, Smith, Pohlman & Allen, Butte, Montana
Kendrick A. Smith argued, Butte, Montana

Submitted: March 7, 1983
Decided: June 20, 1983

Filed:

JUN 20 1983

*Ethel M. Harrison*

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

The Montana Department of Highways brought this action in the Fifth Judicial District Court, Beaverhead County, for the purpose of obtaining right-of-way for a frontage road along Interstate 15. Clinton and Jacqueline Howery owned the 0.76 acre tract subject to the condemnation action. Trial on the issue of just compensation was had after the Department of Highways appealed from an award by the Highway Commission.

The jury returned a verdict in favor of the Howerys in the amount of $243,475.00; $3,750.00 was awarded as damages for the property actually taken and $239,725.00, as damages to the remainder. A final judgment was entered in the amount of the verdict plus interest, costs and fees. The Department of Highways appeals from denial of their motion for a new trial, raising three issues:

1) Whether the District Court erred in admitting the testimony of the landowner concerning the effects of the frontage road on his remaining property?

2) Whether the jury's verdict of $239,725.00 as damages to the remainder was excessive, given under the influence of passion or prejudice and supported only by speculative testimony?

3) Whether the District Court erred in refusing the Highway Department's proposed instructions, numbered 20 and 22?

We affirm.

The Howerys purchased their property which is located about 5 miles south of Dillon, Montana, in 1974. At that time they knew that a new four lane highway, Interstate 15, was to be constructed between Highway 91 and the 3.26 acre tract that they purchased; the Highway Department previously

2

had purchased right of way for this purpose from Howerys' predecessors in interest.

Taking the proximity of the proposed interstate into account, the Howerys constructed two specially designed total containment buildings on their property in 1975.

The Howerys raise hogs for market. The containment buildings are designed to eliminate pig stress, thus improving growth rate at lower feed levels, by controlling the environment during the life cycle of pigs from birth to market. Factors which cause pig stress, such as heat, noise, vibration and dust, are minimized or eliminated through building design.

The proposed frontage road was to be constructed approximately 92 feet from the containment unit buildings. The primary issue during the trial was the extent to which the taking for the frontage road would damage the remainder of the Howery property.

Mr. Howery testified that the increase in heat, noise, vibration and dust that would be produced by the traffic on the frontage road would render his containment unit buildings unuseable and his hog raising operation uneconomical. Therefore, using a cost approach appraisal, Mr. Howery gave his opinion that the depreciation in value to the remaining land and buildings, less any salvage value of the buildings and the unaffected value of their home and unimproved land, was $292,725.00; he further valued the land actually taken at $2,250.00.

The Highway Department contends Mr. Howery's testimony as to depreciation in value to the remainder should have been refused. The Department asserts that the Howerys failed to establish (1) how an increase in pig stress would result from the proposed frontage road and what would be the magnitude of

the increase, and (2) whether the proposed frontage road would be paved or gravel. Lacking such a proper foundation, the Department argues that Mr. Howery's testimony was inherently unreasonable.

The Department's "reasonableness" argument stems from a landowner-witness rule this Court reconfirmed in State v. Marsh, (1974) 165 Mont. 198, 527 P.2d 573. Marsh clarified that in taking cases, the landowner could testify as to value so long as (1) the testimony is reasonable and (2) the value testified to is for the uses to which the landowner is putting the land. Additionally, if the landowner intended to testify as to value for other purposes, the landowner "must have 'some peculiar means of forming an intelligent and correct judgment . . . beyond what is presumed to be possessed by men generally.'" 165 Mont. at 203, 527 P.2d at 576.

The rule of Marsh is not directly applicable to the instant case. Here the State is not contesting the ability of a landowner to give his opinion as to market value before taking; what is at issue is the competence of a landowner to testify as to the causal link between the taking and any damage to remainder, and ultimately to the depreciation in market value of the remainder as a result of the taking.

> "As a general rule, a witness who is competent to give the value of particular real estate may give his opinion of its value immediately before particular damage to it, and its value immediately after such damage and as affected thereby, provided the witness discloses sufficient knowledge of the property in both conditions . . . If an estimate of value or the cause of damage requires special knowledge, persons uninformed as to the facts, and without learning in the scientific principles of which they speak, are not competent . . . " 27 Am.Jr.2d, Eminent Domain, §426, pp. 322-323.

4

Nichol explains that where the issue is whether the construction of a public work causes a decrease in market value of the land remaining after a taking:

> "[i]t is, of course, competent for the owner to point out, either himself or by means of duly qualified expert witnesses, the particulars in which the land has been or will be damaged, such as the inconvenient size and shape in which it is left, the interference with access, the increased accumulation of surface water, the noise and dirt from the use of the public work, and the like."

5 Nichol on Eminent Domain, §23.3, pp. 23-20, 21. The witness may describe the injuries to the property and its condition, state the circumstances affecting the value of the property in its damaged state, and testify as to the value of the property before and after the injury. Nichol, supra, p. 23-24.

The record indicates that Mr. Howery was both informed about the facts concerning the proposed frontage road and very knowledgeable in the business of raising pigs. Mr. Howery had observed the dust associated with the unpaved extension of the frontage road already in existence approximately one mile south of his facility. Additionally he testified that in response to his inquiries about the surface of the proposed frontage road, he was given different answers: one, that the road would be paved; another, that it would be gravel. However he stated the choice of surface would not alter his opinion that the containment buildings would be rendered unusuable by the proximity of the proposed frontage road.

Additionally, Mr. Howery testified that prior to taking, the only roads close to his facilities were unmaintained, private access roads which generated very little traffic. The proposed frontage road, which will pass within 92 feet of

Mr. Howery's confinement facilities, links two highways and serves two saw mills.

Mr. Howery further testified that sows are affected by the vibration caused by a truck passing nearby his facility and that if the noise of the truck is "awfully loud," stress may also result. He also stated increases in heat produce stress in his animals.

Mr. Howery had considerable experience in the swine industry. He was reared on a ranch in Wyoming that raised pigs; since his marriage, he and his family have continued to raise pigs. His educational background includes two years in animal husbandry at Northwest Community College, Powell, Wyoming and about two years in biology at Western Montana College, Dillon, Montana. Additionally, for the past seven years, he has studied the swine industry by subscribing to and reading current national publications. And prior to initiating his total confinement operation, Mr. Howery consulted with several representatives from different building manufacturers and veterinarians associated with Ralston Purina Company in St. Louis.

Moreover, Mr. Howery had practical experience with stress afflicted animals. He knew that confinement, heat, noise, dust and/or vibrations can produce stress in his pigs. He testified that stress afflicted hogs are prone to ulcers, hampered growth and even sudden death. He recognized that confinement alone may produce stress but that thus far he had managed to maintain his pigs per litter ratio, referring to pigs weaned, above the national average, with minimal loss between weaning and marketing.

Mr. Howery's testimony was reinforced by Dr. Earl Pruyn, a Missoula veterinarian who was knowledgeable about pig containment units and porcine stress syndrome.

Dr. Pruyn, stated that, in his opinion, the proximity of the frontage road to the Howery pig buildings would "either rapidly or slowly" make the Howery operation uneconomical. Dr. Pruyn had visited the Howery property, concluded the Howerys ran an above average, exceptionally clean operation, and was familiar with the frontage road construction proposal. He based his opinion on several facts: (1) the pigs raised by Howerys were very susceptible to porcine stress syndrome; (2) the frontage road would be located relatively close to the gestation and farrowing portion of the building, which from his experience should be protected from highways or high-use secondary roads; (3) that road such as the State proposed for construction produce noise, vibration and dust; and (4) that the road would reduce the wet areas and grasslands surrounding the confinement facility, thereby heating the air transmitted into the facility via its ventilation system and making the buildings more susceptible to vibrations produced by increased traffic.

The District Court committed no error in permitting Mr. Howery to testify as to reduction in value which would result from the new road. Where a landowner-witness is informed as to the facts regarding the construction and use of a public work, and has an acquired and/or applied understanding of the technical and practical aspects of its impact on his or her property and its income producing capacity, the landowner-witness is competent to estimate before and after value as to that particular use, or the cause of damage to his remaining property.

The Department of Highways next contends that the jury's verdict for depreciation in value to remainder was excessive and supported only by speculative and conjectural evidence. A two prong argument is asserted: (1) Mr. Howery failed to

7

prove causation; and (2) Mr. Howery's opinion on depreciation in value was not based upon market data or upon mental impressions held by "respective purchasers" in the swine industry.

Our discussion of issue one disposes of the department's first assertion. As to the second, the Wyoming decision relied upon by the Department, Coronado Oil Co. v. Grieves (Wyo. 1982), 642 P.2d 423, is factually distinguishable. There, the analysis of the testimony disclosed that the landowners and their appraiser did not employ a standard of fair market value but rather opined the value of the remainder to them personally. 642 P.2d at 434-35. Clearly, this wa unacceptable.

Here, Mr. Howery testified that he understood the concept of market value, and lacking comparable sales to derive market value, employed an acceptable alternative approach to ascertain depreciation in market value after the taking. Furthermore, Mr. Howery's testimony was consonant with that of Mr. Roy Rodenburger, a Missoula appraiser experienced in appraisals of rural properties. Mr. Rodenburger stated that after the taking the Howery's hog operation had only a residual value of $12,000.00, representing the salvage value of the facilities. In Mr. Rodenburger's opinion, the total depreciation in market value of the hog facilities caused by the taking amounted to $235,795.00. He stated his opinion was based on his inspection of the Howery facilities, his past experience in appraising other hog operations, his discussions with Mr. Howery and Dr. Pruyn, and reproduction cost figures supplied to him by the Dillon Livestock Market Company. Thus, we conclude the jury's verdict was not based on speculative or

8

conjectural evidence. Nor was it excessive in light of the evidence presented.

We have long followed the rule in eminent domain proceedings that the jury findings will not be disturbed on appeal unless they are so obviously and palpably out of proportion to the injury done to be in excess of just compensation. State Dept. of Highways v. Schumacher (1979) 180 Mont. 329, 590 P.2d 1110, and cases cited therein.

The record before us belies any such obvious and palpable error as to the jury valuation of the Howery loss.

Finally the Department of Highways contends that the District Court erred in refusing its proposed jury instructions numbered 20 and 22. Proposed instruction No. 20 cautioned the jury that the Howerys could not be awarded any amount for depreciation in value to the remainder caused by the construction of the interstate. Proposed instruction No. 22 explained the manner in which state highways or county roads are legally abandoned. This instruction went to the Department's argument that two forks from the Jackson Road, were public roads, not private access routes, and that the proposed frontage road would actually reduce traffic on them.

The District Court committed no error in refusing to give the proposed instructions. Instruction 20 was a negative instruction. This Court has discouraged such instructions to avoid the introduction of non-issues in a case. See Brown v. North American Mfg. (1978), 176 Mont. 98, 576 P.2d 711.

Instruction 22 was within the discretion of the trial court to give. It does not appear the Department was prejudiced by its refusal. Absent a showing of prejudice, the trial court's discretion will not be disturbed.

Affirmed.

_____
Justice

We concur:

_____

_____
John C. Sheehy

_____
Justices

Mr. Justice Daniel J. Shea will file a special concurrence later.