[Civ. No. 10486. Third Dist. Apr. 11, 1963.]

SACRAMENTO AND SAN JOAQUIN DRAINAGE DIS-
TRICT ex rel. THE STATE RECLAMATION BOARD,
Plaintiff and Appellant, v. THOMAS H. REED et al.,
Defendants and Respondents.

Stanley Mosk, Attorney General, Raymond H. Williamson and John M. Morrison, Deputy Attorneys General, for Plaintiff and Appellant.

McPherson & Mulkey and Jack M. McPherson for Defendants and Respondents.

FRIEDMAN, J.—The farm of defendant Thomas H. Reed consists of a 137-acre parcel on the west bank of the Sacramento River approximately 26 miles north of Colusa. Adjoining it to the south is the farm of defendant Frank S. Reager, approximately 463 acres in area. The State Reclamation Board filed this condemnation action to acquire a right of way for a new levee across these properties, the levee being a portion of the Sacramento River Flood Control Project. Shortly after the action was filed the levee was constructed, award of damages to the landowners being left for later determination. The new levee runs in a north-south direction parallel to the river and almost bisecting both farms. Each landowner, then, has substantial acreage on the river side of the levee.

The strip taken for the new levee is 40 to 50 feet wide on the Reed property and 50 to 60 feet wide on the Reager property, fenced on both sides with steel posts and barbed wire. The levee is 30 to 35 feet wide at its base and narrows upward to a 20-foot crown. Since the ground undulates, height of the levee varies from 5 to 7 feet on the Reed property and 6 to 8 feet on the Reager property. Height of the levee was designed to provide three feet of freeboard above a "50-year" flood stage.

On the Reed parcel the partial "take" consisted of 11.75 acres, of which 2.93 acres were condemned for the levee, 2.61 acres for access rights, and 6.21 acres for earth borrow. The "take" on the Reager parcel was 6.55 acres, all for the levee right of way.

Both properties are devoted to agricultural purposes, although some alluvial and brush land on the Reager property is uncultivated. Although these lands were formerly subject to some winter flooding, construction of Shasta Dam had eliminated most of the overflow. There were no former levees on the Reed farm. About two-thirds of the Reager property was crossed by an old private levee, and the new levee was built along the identical alignment. Height of the new levee above the crown of the old levee is a matter of conflict, but it is perhaps 3 to 5 feet higher than the latter.

On the northwest portion of the Reed ranch are a dwelling

house and agricultural buildings. A fenced road leads eastward towards the pasture lands bordering the river. In former years the road permitted free movement of livestock and equipment across the ranch. Now, at the point where the road meets the levee, a fenced ramp has been installed across the latter. The ramp now provides the only access to the waterward side of the ranch.

On the Reager property also, the levee now separates the dwelling site and barn area from the river. A 12-foot fenced ramp has been installed across the levee to give access to the acreage east of the levee. Reager has additional access to the acreage east of the levee by means of a revocable permission to cross some neighboring county land. There is evidence of some difficulty in getting farm equipment across the levee ramps and that these ramps are too narrow to permit passage of a large bulky piece of equipment such as a land plane. The new levee has obstructed the waterward view from both dwelling places.

The case went to trial and the jury awarded each defendant damages for the land taken, special damages and severance damages. The severance damages fixed by the jury were $12,000 in the case of Reed and $24,111 in the case of Reager. Plaintiff's motion for a new trial was denied, but the trial court reduced the Reager severance damage award to $22,844. On appeal plaintiff Reclamation Board contends that judicial errors permitted inclusion of noncompensable and speculative elements in the severance damages.

We set forth some general considerations as a guide for evaluating plaintiff's contentions. Severance damage resulting from partial condemnation may be shown either by proving the market value of the remaining land before and after the taking, leaving computation of the difference to the jury, or by competent evidence of damage in a lump sum. (*Pacific Gas & Elec. Co.* v. *Hufford,* 49 Cal.2d 545, 555 [319 P.2d 1033]; *People* v. *Hayward Bldg. Materials Co.,* 213 Cal.App.2d 457, 464-465 [28 Cal.Rptr. 782].) Not every depreciation in value of the property left in the landowner's hands can be made the basis of a damage award. It has been said that damages may not be allowed for mere personal annoyance or discomfort in the use of property, even when such factors adversely affect saleability (*People* ex rel. *Dept. of Public Works* v. *Symons,* 54 Cal.2d 855, 858-859 [9 Cal.Rptr. 363, 357 P.2d 451]; *Eachus* v. *Los Angeles etc. Ry. Co.,* 103

Cal. 614, 617 [37 P. 750, 42 Am.St.Rep. 149]); for the inconvenience caused by circuity of travel (*People* v. *Ricciardi,* 23 Cal.2d 390, 401-402 [144 P.2d 799]; *Blumenstein* v. *City of Long Beach,* 143 Cal.App.2d 264, 270 [299 P.2d 347]); for speculative, remote or imaginary losses or for advance recoupment for torts or other injuries that may or may not be committed (*Arnerich* v. *Almaden Vineyards Corp.,* 52 Cal.App.2d 265, 272 [126 P.2d 121]); for detriment caused by construction of public works on the property of third persons (*People* ex rel. *Dept. of Public Works* v. *Symons, supra,* 54 Cal.2d at pp. 860-861). When caused by construction of a public improvement on the severed land, the following have been held to be permissible elements of compensation: deprivation of street access (*Bacich* v. *Board of Control,* 23 Cal.2d 343 [144 P.2d 818]); impairment of light and air (*Rose* v. *State,* 19 Cal.2d 713 [123 P.2d 505]); impairment of view and loss of privacy (see *People* ex rel. *Dept. of Public Works* v *Symons, supra,* 54 Cal.2d at p. 860; Annot. *Interference with View,* 84 A.L.R. 2d 348).

Translated into concrete rules of evidence, these concepts have been described in terms of restrictions on opinion evidence of market value. A value opinion based upon depreciation attributed to legally noncompensable factors should be excluded, according to the leading opinion in *Rose* v. *State supra,* 19 Cal.2d at p. 741. ▇ Elements affecting value which are possible but not reasonably probable should be excluded. (*People* v. *Ocean Shore Railroad, Inc.,* 32 Cal.2d 406, 426 [196 P.2d 570, 6 A.L.R.2d 1179].) ▇ Where cross-examination reveals that loss-of-value testimony was based on noncompensable items, the testimony will be stricken in response to a proper motion. (*People* v. *Dunn,* 46 Cal.2d 639, 641 [297 P.2d 964]; *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255 [1 Cal.Rptr. 250]; *Reclamation Dist. No. 730* v. *Inglin,* 31 Cal.App. 495 [160 P. 1098]; see also dissenting opinion, *Rose* v. *State, supra,* 19 Cal.2d at p. 745.)

*Rose* v. *State, supra,* rejected the rule, accepted in some states, that severance damage may be established by testimony relating to any factor, even though noncompensable in itself, which would make the property less desirable in the eyes of a prospective purchaser. Fifteen years after the *Rose* case, *Pacific Gas & Elec. Co.* v. *Hufford,* 49 Cal.2d 545 [319 P.2d 1033], sanctioned an expert's opinion of loss of market value based on described hazards which, the witness said, a prospec-

tive buyer would consider. The psyche of a prospective buyer is hardly affected by technical rules of severance damage. Nevertheless, *Hufford* did not embrace the doctrine, rejected in *Rose*, which permits loss-of-value opinions based on any factor (regardless of intrinsic compensability) which might repel a prospective buyer. Three years later, in *People* v. *Symons, supra,* an extensive dictum reviewed the case law on compensable elements of severance damage, but without expressing these abstractions in terms of what a valuation witness may or may not say in a trial court before a jury.

Uncertainties of California doctrine in this field have been explored in some detail. (See comment, 34 So.Cal.L.R., pp. 319-334.) In this state of the law we seek to appraise parallel problems raised here.

According to plaintiff, one noncompensable element permitted to play a role in the jury's determination of severance damages was the planning for future levees on the east side of the Sacramento River, opposite the Reed and Reager parcels. As is well known, the entire Sacramento River Flood Control Project consists of a vast and intricate general plan for levees, bypasses, weirs and other works designed for flood control, reclamation and improvement of navigation. It is a cooperative federal-state venture which has been in the process of design and construction for over half a century. It has been described in so many reported appellate decisions that further exposition is unnecessary. (See *Beckley* v. *Reclamation Board,* 205 Cal.App.2d 734 [23 Cal.Rptr. 428], and cases cited at page 739.) Suffice it to say that one particular phase of the project which has been under consideration at various times since 1917 is the reclamation of Butte Basin on the easterly side of the river. The Reed and Reager properties lie across the river from the upper portion of Butte Basin. At present, as it has for decades in the past, excess winter flow of the Sacramento River moves through weirs and channels easterly across Butte Basin and southerly into Sutter Basin. (See *Clement* v. *State Reclamation Board,* 35 Cal.2d 628, 632-635 [226 P.2d 897] ; *Gray* v. *Reclamation Dist. No. 1500,* 174 Cal. 622, 631-632 [163 P. 1024].)

One aspect of the Butte Basin proposal involves control facilities at Chico Landing (some miles north of the Reed and Reager properties) to channel a portion of the Sacramento River's seasonal overflow into a bypass extending along the east side of Butte Basin. Alternate planning would entail

construction of a dam across the Sacramento River at a site called Table Mountain. (See Cal. Wat. Code, § 12649.) Either of these devices would reduce the southward flow of winter high water to a volume which could be contained within parallel levees along the westerly side of Butte Basin, thus permitting reclamation of the latter.

The federal Flood Control Act of 1944 (Public Law 534, 78th Cong., 2d Sess.; 58 Stat. 887) authorized a series of flood control projects recommended by the Chief of Engineers in House Document No. 649 of that session. The latter, by reference, incorporated a district engineer's report to which was appended a map showing proposed new levees on the east side of the river. A later statute, the Flood Control Act of 1950 (Public Law 516, 81st Cong., 2d Sess.; 64 Stat.163), also authorized flood control projects for the Upper Butte Basin in accordance with a report of the Chief of Engineers designated as House Document No. 367, 81st Congress. The latter recommended appropriation for levee construction at Butte Basin "if later study shows construction of such levees to be advisable." The program has also been authorized by California law. (Wat. Code, § 12648.)

At the outset of the trial in this case, plaintiff made a motion to exclude evidence of damage from increased flooding which might be caused by future construction of levees on the east side of the river, across from the Reed and Reager properties. A civil engineer engaged in project planning for the Corps of Engineers was called to testify outside the presence of the jury. He testified that, although general plans for Butte Basin reclamation (including east-side levees) had been in existence for many years, there had been no specific designs or construction in view of local opposition to the project; that if there were public acceptance, the project might take 5 to 30 years for completion; that Congress had not at any time appropriated funds for construction of east-side levees; that planning for the Butte Basin reclamation project would involve not only levees on the easterly bank of the river but also another levee on the Reed and Reager parcels closer to the river bank, resulting in abandonment of the levee in suit; that in the absence of detailed plans for east-side levees and without hydraulic investigations, it would be impossible to reach any accurate conclusions as to the extent of increased flooding on defendants' lands.

In opposition to the motion to exclude, defense counsel

argued that a prospective purchaser would seek explanation for the 8-foot height of a levee on land subject to so little overflow as defendants'; that, on inquiry, the prospective buyer would have to be told that the levee height was necessitated by the possibility of future levees across the river which would push additional overflow on defendants' riverward farmlands; that such an explanation would have an adverse effect on market value. The trial court fully recognized inadmissibility of direct evidence of diminished value attributable to such future projects. The court ruled, however, that possibilities of future flooding attributable to east-side levees and suggested to a prospective purchaser by the present height of the levee in suit was a permissible factor in establishing severance damages.

In the course of the trial Mr. Reager and Mr. Reed gave testimony estimating severance damages to their respective properties. Mr. Reager fixed the loss of market value of his remaining lands at sums ranging from $43,260 to $69,704. On cross-examination Reager ascribed some portion of the loss to the fact that height of the levee on his own land would cause a purchaser to "wonder what they are going to do on the other side." Plaintiff's motion to strike Reager's appraisal of severance damage was denied.

Mr. Reed estimated his own severance damage at $19,973.65. He ascribed some portion of the loss figure to reasons similar to those described by Reager. Mr. Rhodes, an expert witness called by the defense, fixed severance damages at $24,111 for the Reager property and $8,400 for the Reed property. On cross-examination he admitted "partial reliance" on the assumption that there would be increased flooding on the waterward side of the Reager property by reason of anticipated construction of levees on the east side of the Sacramento River. There was no motion to strike Reed's or Rhodes' valuation testimony.

On appeal plaintiff assigns as error the court's limited admissibility ruling and the refusal to strike Mr. Reager's testimony. Counsel for defendant make no argument as to the absence of motions to strike the Reed and Rhodes testimony and we think rightly so. Plaintiff's attorneys had moved for complete exclusion and had presented evidence to support it. The court then ruled in favor of a kind of limited admissibility. At that point both court and counsel knew where they stood. There was no necessity for additional objections and motions aimed at the same point of law and calculated

only to "make a record" for appeal. (*Wilcox* v. *Sway,* 69 Cal.App.2d 560, 570 [160 P.2d 154]; *Moore* v. *Norwood,* 41 Cal.App.2d 359, 368-369 [106 P.2d 939].)

While the "motion to exclude" was not a conventional procedure, it was well conceived under the circumstances. Counsel for the condemner might have waited until a valuation witness had testified and, after eliciting on cross-examination that his appraisal had included impermissible factors, moved to strike it. Such a motion, even when soundly grounded, generates practical difficulties for witness, counsel and court. (See *Rose* v. *State, supra,* 19 Cal.2d at pp. 742, 745-746; *Buena Park School Dist.* v. *Metrim Corp.,* 176 Cal.App.2d 255, 262 [1 Cal.Rptr. 250]; *People* v. *Loop,* 127 Cal.App.2d 786, 792-801 [274 P.2d 885]; *City of Redding* v. *Diestelhorst,* 15 Cal.App.2d 184, 192 [59 P.2d 177]; *City of Stockton* v. *Ellingwood,* 96 Cal.App. 708, 722-723 [275 P. 228]; California Condemnation Practice (Cont. Ed. Bar) p. 297.) An order granting the motion in midtrial frequently has harsh effects, and trial judges are understandably reluctant to make it. No matter how well justified in law, the order may find the valuation witness without a prepared substitute opinion. Possibility of the order may involve witnesses in formulating substitute value opinions as a secondary line of defense, only to find they are not needed. The order imposes on jurors the intellectual surgery entailed by any direction to ignore what has been heard. The motion to exclude adopted in this case is vastly more rational. It reduces the surprise factor. It is calculated to iron out a disputed issue before the jury trial gets under way and before the actual expression of value opinions. Expanded pretrial discovery techniques furnish occasion for its use (see *Oceanside Union School Dist.* v. *Superior Court,* 58 Cal.2d 180 [23 Cal.Rptr. 375, 373 P.2d 439]). The motion in this case was precisely directed at a well-defined issue. It was an entirely proper mode of objection. Once the trial court ruled on it, no further objections or motions were necessary to preserve the point for appeal purposes.

Considered as direct evidence of severance damage, the potentiality of increased water burden attributable to future east-side levees was inadmissible on at least two counts: First, it ran counter to the California doctrine which excludes from severance damage consequential losses from construction or operation of public improvements on lands belonging to others. (*People* ex rel. *Dept. of Public Works* v. *Symons,*

*supra*, 54 Cal.2d 855, 861; *County Sanitation Dist.* v. *Averill*, 8 Cal.App.2d 556, 561 [47 P.2d 786] ; see 4 Nichols, Eminent Domain, pp. 514-517; 170 A.L.R. 721-728.) Second, the conjectural character of the east-side levee proposal brought the flooding within the ban against speculative and contingent losses. (*Arnerich* v. *Almaden Vineyards Corp.*, 52 Cal.App. 2d 265, 272 [126 P.2d 121] ; 17 Cal.Jur.2d 673-674.) The ruling of the trial court permitted indirect use, in the formulation of value testimony, of factors not directly permitted. The theory, in apparent reliance on *Pacific Gas & Elec. Co.* v. *Hufford, supra,* was that a valuation witness may state as a ''reason'' for his opinion any detrimental factor which the witness might choose to attribute to a prospective purchaser, so long as the detriment in some way arises from the project in suit.

The *Hufford* case warrants no such approach. The approach ignores the fact that the ''prospective purchaser'' is an abstraction, a ventriloquist's dummy who speaks only with the voice of the flesh-and-blood valuation witness. In feeding words to the fictional buyer, the witness — be he appraiser or landowner — is confined only by his own imagination and by such narrower limits as the law may impose on him. A condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner. (See Kratovil and Harrison, *Eminent Domain—Policy and Concept*, 42 Cal.L.Rev. 596, 626.) There is a limit to imaginative claims even when described in terms of a prospective buyer's mental reactions. To say that only the witness' valuation opinion has probative value, that his ''reasons'' have none, ignores reality. His reasons may influence the verdict more than his figures. To say that all objections to his reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts. (*People* ex rel. *Dept. of Public Works* v. *Symons, supra,* 54 Cal.2d at p. 861; *People* v. *Ricciardi, supra,* 23 Cal.2d at p. 396.)

*People* v. *O'Connor,* 31 Cal.App.2d 157, 159 [87 P.2d 702], states as sound a criterion as any. In sustaining valuation testimony assailed as conjectural and speculative, the court described the elements of damage in the following terms: ''These elements of damages mentioned by the witnesses are

not claimed by respondents as special damages, but are merely the reasons given by the experts for their opinions that the market value of the portion of the tract not taken would be diminished by reason of the taking of the 1/10-acre strip in front. They are not conjectural but actual admitted facts...."

In this case, through a semantic device, the jury received indirectly what it could not get directly: speculative evidence of diminished values attributed to a proposed project on other lands, a project which had been in the talking stage for several decades, which was still subject to debate, and for which there was no federal appropriation. The device consisted of postulating a figurative buyer whose "fears" were substituted for a realistic statement of actual losses and impairments. The valuation opinions were based not on "actual admitted facts" as in *People* v. *O'Connor, supra,* but on a conjectural buyer's conjectural fears of conjectural flooding created by conjectural levees. If and when any of defendants' lands are placed within a flood trough, defendants may then assert their right to compensation, whatever it may be. (*People* v. *Adamson,* 118 Cal.App.2d 714, 722 [258 P.2d 1020]; see *Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628; *Beckley* v. *Reclamation Board, supra,* 205 Cal.App.2d 734.) A present award of severance damage based in part on this element would provide them compensation in advance of any possible entitlement.

Affecting as it did that half of defendants' remaining lands east of the levee in suit, the speculative element played a major role in the valuation opinions. Admission into evidence of opinions so conceived was error.

Viewed in the light of the record, the error was prejudicial. Mr. Rhodes, the defendants' expert witness, had conceded partial reliance on the east-side levee proposals in fixing his estimate of decreased value. He fixed the Reed severance damages at $8,400. The jury's severance damage award to Reed was $12,000, which was $3,600 more than the figure set by his own expert. Reager's severance damage was fixed by the jury at $24,111, which was the precise amount given by Mr. Rhodes. Both landowners had testified to substantially greater amounts. In fixing the awards at or higher than the figures given by defendants' own expert, the jury were allowing damages for at least all the detriment described by the expert, including the speculative flooding attributed to eastside levees.

Defense counsel points to several instructions in which the jury were instructed against allowance of damage for increased flooding due to east-side projects in the planning or discussion stage. The court, however, had permitted evidence of such damage by indirection. The jury awards, equal to or exceeding the amounts fixed by an expert witness who had admittedly considered this impermissible factor, demonstrate that the jury paid scant attention to the limiting instructions. The provisions of article VI, section 4½, of the state Constitution cannot save this judgment.

Appellant contends that the following factors described by one or both landowners as bases for their loss-of-market-value opinions, were erroneously allowed. Inasmuch as the cause must be remanded for a new trial on the issue of severance damages, it may be helpful to discuss these items briefly: (1) objections to appearance of levee across property; (2) increased weed problem due to landowners' inability to control weed growth within levee right of way; (3) difficulty in moving livestock across levee ramps; (4) loss of visibility toward the river, making it impossible to see trespassing hunters and fishermen; (5) in the case of Reed, nuisance elements, including possibility of trespassing hunters attracted by presence of a 6.21-acre borrow pit on his land; (6) in Reager's case, restricted access across the levee in the event of loss of access privilege across neighboring county land.

Compensability of aesthetic claims has never been expressly approved in California. Decisions of other states on the point are in some conflict. (See 4 Nichols on Eminent Domain (3d ed.) § 14.243, p. 583; 5 *op. cit.*, § 16.103(2), p. 63.) The remaining factors might be classed as mere inconveniences; or as speculative and contingent injuries. In that sense they would fall within the ban of the cases, *supra,* which bar severance damage opinions based on noncompensable items. These factors were not placed before the jury as individual items of value depreciation; rather, in composite, they represented a set of undesirable effects which a prospective purchaser might consider, thereby adversely affecting market value. Unlike conjectural flooding, these effects were all attributable to the physical characteristics of the project in suit. Such claims are permissible under the doctrine of *Pacific Gas & Elec. Co.* v. *Hufford, supra,* 49 Cal.2d 545. They are subject, however, to the trial court's power to pass on the *reasonableness* of individual assertions of detriment if and when objection is

made. (*People* v. *Stevenson & Co.*, 190 Cal.App.2d 103, 107-108 [11 Cal.Rptr. 675]; see 1 Orgel on Valuation under Eminent Domain (2d ed.) § 61, pp. 276-281.)

Other issues discussed in the briefs will not arise or may be eliminated on retrial, and we need not consider them here.

That portion of the judgment fixing severance damages is reversed and the cause is remanded for a new trial on that issue.

Pierce, P. J., and Schottky, J., concurred.