[No. D025650. Fourth Dist., Div. One. June 1, 1998.]

CITY OF SAN DIEGO, Plaintiff and Respondent, v.
FRED SOBKE, Defendant and Appellant.

CITY OF SAN DIEGO, Plaintiff and Respondent, v.
JESUS MONZON, Defendant and Appellant.

**COUNSEL**

Worden, Williams, Richmond & Ellis, D. Dwight Worden and James H. Ellis III for Defendants and Appellants.

Daley & Heft and Scott Noya for Plaintiff and Respondent.

**OPINION**

**KREMER, P. J.**—In these consolidated eminent domain actions brought by the City of San Diego (City), defendants Fred Sobke and Jesus Monzon appeal a judgment under Code of Civil Procedure[1] section 631.8 favoring the City on their claim for compensation for lost goodwill. Defendants assert prejudicial evidentiary error. We affirm the judgment.

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise specified.

# I

## INTRODUCTION

Under the names Baja-Mex Insurance Services, Incorporated, and Baja-Mex Insurance and Money Exchange, defendants Sobke and Monzon operated businesses as tenants on two adjacent parcels condemned by the City for road improvement purposes.[2] In the City's consolidated eminent domain actions, Baja-Mex claimed entitlement to recover for loss of goodwill under section 1263.510 based upon decreased benefits accruing to its business as a result of its location after condemnation.[3] The superior court granted the City's motion to strike the testimony of Baja-Mex's expert certified public accountant/attorney/appraiser Brian Brinig as based upon an unacceptable methodology for valuing the existence and loss of goodwill. The court then entered judgment favoring the City on Baja-Mex's claim.

# II

## FACTUAL AND PROCEDURAL BACKGROUND

Since 1975 Baja-Mex has operated a number of currency exchange and Mexican insurance businesses in the City's San Ysidro neighborhood near the international border with Mexico.

In 1988 Baja-Mex as tenant opened its office No. 4 on two adjacent San Ysidro parcels (Parcels 1 & 2) on East San Ysidro Boulevard in a prime area for currency exchange businesses. Configured as a "compound" with a fence running along the property's boundaries not bordering the boulevard and with the rear of the property lighted along the fence, the two parcels

---

[2]We may refer to Baja-Mex Insurance Services, Incorporated, Baja-Mex Insurance and Money Exchange, Sobke, and Monzon collectively as Baja-Mex.

[3]Section 1263.510 provides:

"(a) The owner of a business conducted on the property taken, or on the remainder if such property is part of a larger parcel, shall be compensated for loss of goodwill if the owner proves all of the following:

"(1) The loss is caused by the taking of the property or the injury to the remainder.

"(2) The loss cannot reasonably be prevented by a relocation of the business or by taking steps and adopting procedures that a reasonably prudent person would take and adopt in preserving the goodwill.

"(3) Compensation for the loss will not be included in payments under Section 7262 of the Government Code.

"(4) Compensation for the loss will not be duplicated in the compensation otherwise awarded to the owner.

"(b) Within the meaning of this article, 'goodwill' consists of the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

provided an appearance of security for Baja-Mex's customers. Accessible parking with good visibility from Baja-Mex's business operations differentiated office No. 4 from its competitors.

## A

### *Pretaking Condition of Parcel 1*

In August 1991 Baja-Mex leased Parcel 1 from the property's owner for 10 years, ultimately at a monthly rental of about $4,800. The lease provided for a rent proration if a portion of Parcel 1 were condemned. Baja-Mex operated most of its business at office No. 4 from a small (425 square feet) free-standing building on Parcel 1 in the center of the compound. The small free-standing building included one drive-through cashier station, three cashier windows inside, and an office in the rear. From that building, Baja-Mex controlled access to both parcels.

Baja-Mex also operated two cashier windows in two hundred fifty square feet of an adjacent larger building (the furniture store building) on Parcel 1. Baja-Mex subleased most of the furniture store building for $3,200 monthly to a furniture retail outlet operated by Giron. The sublease's term was from September 1991 through August 1996. The sublease provided that if part of the small free-standing building were lost by condemnation, Baja-Mex could use an additional 250 square feet inside the furniture store building with subtenant Giron receiving a prorated rent reduction. However, in early 1994 after experiencing difficulties in paying rent Giron vacated the furniture store building for reasons unrelated to the property's impending condemnation by the City. Despite inquiries by potential new subtenants, Baja-Mex did not sublease the furniture store building due to uncertainty about the upcoming condemnation and the lack of adjacent parking. Unsuccessful in locating Giron, Baja-Mex did not seek to enforce the remainder of the sublease against him.

## B

### *Pretaking Condition of Parcel 2*

Meanwhile, in 1988 Baja-Mex began leasing Parcel 2 from the property's owner for one year initially and then on a month-to-month basis, ultimately for about $767 monthly rent. Baja-Mex subleased a trailer coach on Parcel 2 to a perfume store on a month-to-month basis, ultimately for about $840 to $870 monthly rent.

In December 1993 Baja-Mex's subtenant vacated the trailer on Parcel 2 due to the impending condemnation by the City.

## C

### The Taking

In January 1994 the City filed these two related and ultimately consolidated eminent domain actions to condemn portions of the two parcels for road improvement purposes. Answering the City's lawsuits, Baja-Mex sought to recover compensation for loss of goodwill caused by the taking.

In May 1994 the superior court authorized the City to take possession of the condemned portions of the two parcels.

In June 1994 the City removed the small free-standing building from Parcel 1. The City also moved the trailer elsewhere upon Parcel 2. The City then proceeded to build a street across the condemned portions of the two parcels. Baja-Mex negotiated with the City about the eventual configuration of the property. During construction Baja-Mex kept its business operations open and worked with the contractor to arrange parking available for its patrons.

In May 1995 the City finished its road improvement project. Construction of the street passing between the remaining portions of the two parcels eliminated their configuration as a compound, decreased Baja-Mex's ability to control use of the parcels, and lowered the number of parking spaces adjacent to Baja-Mex's business operations.

## D

### Post-taking Condition of Remainder of Parcel 1

In June 1994 instead of paying prorated rent for the remainder of Parcel 1, Baja-Mex entered into an amended lease with the property owner for $4,000 monthly, an amount believed by Sobke to be reasonable. Baja-Mex moved all its business operations into the furniture store building remaining on Parcel 1 and took over the entire building despite Monzon's belief that continuation of the business did not require all of such space. Baja-Mex began operating six cashier windows in the furniture store building. Baja-Mex also remodeled the furniture store building and negotiated with the City to retain some adjacent parking. However, the loss of parking caused by the condemnation limited Baja-Mex's ability to sublease any portion of the furniture store building. Due in part to parking limitations, Baja-Mex did not seek subtenants for the furniture store building. One end of the furniture store building remained vacant.

During 1994 Baja-Mex began contributing to a pension fund program for its employees.

After moving its operations to the furniture store building, Baja-Mex began offering expanded services there. By late 1995 at the furniture store building Baja-Mex offered check cashing, faxes, money orders, Mexican money orders, and post office box rentals in addition to continuing its money exchange and Mexican insurance business operations. Baja-Mex hired an employee to oversee its additional business services offered at office No. 4, added equipment to the property to advertise those additional services and rented a billboard along the adjoining freeway. Consistent with its practices before the condemnation, Baja-Mex continued using employees "shared" by its stores located elsewhere. Baja-Mex also added a new business location (the Texaco location) about 100 yards away from its office No. 4 in part to prevent another business from locating there. Due to an audit, Baja-Mex changed its business procedures by assigning an employee to cross-check transactions requiring reports to the federal government.

E

*Posttaking Condition of Remainder of Parcel 2*

In February 1994 Baja-Mex notified the owner of the remainder of Parcel 2 that it no longer wanted to rent the parcel but instead would vacate the property in 30 days. The property owner responded by seeking to rent the parcel to another money exchange business. Eventually, motivated by the need for sufficient parking during peak business hours and in part by the desire to prevent occupancy by another money exchange, Baja-Mex agreed to rent the remainder of Parcel 2 plus an adjacent "Quonset hut" parcel for three months at the higher rent of $1,700 monthly for those two properties combined. Ultimately, Baja-Mex leased the remainder of Parcel 2 along with the Quonset hut parcel for two years at the increased monthly rent of $2,400.

Meanwhile, after June 1994 the trailer moved elsewhere upon Parcel 2 by the City was inoperable as lacking necessary utility connections. Deeming the expense of connecting the utilities to be excessive, Baja-Mex did not seek to rent out the trailer to a subtenant.

In November 1995 Baja-Mex subleased the Quonset hut with a small adjacent parking area to a shoe store.

F

*Baja-Mex's Business After the Taking*

Monzon believed the property's configuration after condemnation was worse due to parking limitations. Because construction after the taking

resulted in separation of its business premises by a street, Baja-Mex increased its number of employees by hiring additional parking attendants to control use of its parking areas, help customers and provide a sense of security to patrons. Although Sobke thought it would be profitable to open a money exchange in the trailer because in the post-taking configuration the trailer had frontage visibility at an intersection with a traffic signal, Baja-Mex delayed any immediate implementation of the idea due to cost and lack of time.

Baja-Mex kept separate income records for each of its seven business locations. Although Baja-Mex kept expense records for all its stores on a consolidated basis, at the time it met with Brinig in 1993 Baja-Mex segregated the expenses for office No. 4 for years 1988 through 1992, permitting calculation of net income. However, after the condemnation, Baja-Mex never generated any written study comparing the net income, profitability or parking availability for office No. 4 in its pretaking and post-taking conditions. Similarly, Baja-Mex did not compare the number of transactions at office No. 4 in its pretaking location with those in the post-taking location.

When the Mexican peso was volatile or devalued, Baja-Mex commonly experienced increased earnings. In December 1994, upon devaluation of the Mexican peso, Baja-Mex's gross monthly earnings at office No. 4 rose from about $50,000 to $198,000. Baja-Mex's gross earnings at office No. 4 continued high through April 1995.

G

*Resolution of Eminent Domain Proceedings*

In November 1995, after severance of Baja-Mex's goodwill claim, judgment upon stipulation was entered on the remainder of the consolidated cases involving the property owners' interests.

In December 1995 Baja-Mex's claim for compensation for loss of goodwill was tried to the superior court. Baja-Mex presented evidence including Brinig's expert opinion that the condemnation caused Baja-Mex to lose $389,760 in compensable goodwill resulting from its increased expenses for additional rent, additional employee costs for parking lot attendants, and decreased rental income from subtenants. Brinig testified his methodology for valuing loss of goodwill was appropriate under this case's specific circumstances and explained his results calculated using such approach. The parties disputed whether Brinig's goodwill valuation methodology was appropriate. After argument by counsel, the court granted the City's motion to

strike Brinig's testimony. Then, after rejecting Baja-Mex's additional request for mitigation expenses, the court granted the City's motion for judgment under section 631.8 on the ground Baja-Mex had presented no competent opinion evidence on the existence of goodwill in the property's pretaking condition or on its alleged loss of goodwill.

In January 1996 the court entered judgment favoring the City against Baja-Mex. Baja-Mex appeals.

## III

### DISCUSSION

Baja-Mex contends the judgment should be reversed and the matter remanded for new trial since the superior court assertedly prevented a full and fair evaluation of its claims for lost goodwill and for mitigation expenses by striking the testimony of its expert Brinig. Citing *People* ex rel. *Dept. of Transportation* v. *Muller* (1984) 36 Cal.3d 263 [203 Cal.Rptr. 772, 681 P.2d 1340] (*Muller*), Baja-Mex contends under section 1263.510 it was entitled to present to a trier of fact Brinig's valuation methodology and conclusions about loss of goodwill and recoverable mitigation expenses even though his approach differed from "traditional" valuation methodologies.

Asserting Baja-Mex did not meet its burden to establish the existence of goodwill, the City contends the trial court properly struck Brinig's testimony as not valuing the business's goodwill in either its pretaking or posttaking condition but instead simply stating the present value of the business's increased rent and wage costs after condemnation.

On this record we conclude the superior court acted within its discretion in striking Brinig's testimony. Although Brinig characterized his valuation methodology as reasonable and appropriate to the unique situation presented here, Brinig's approach did not establish the existence or loss of goodwill.

### A

#### *The Law*

"Historically, business goodwill was not an element of damages under eminent domain law. As recently as 1975, the California Supreme Court reaffirmed the principle that damage to a business conducted on property condemned for public use was not compensable as a property right under the just compensation clause of the California Constitution. [Citation.] But in

1975, the Legislature enacted a comprehensive revision of California's eminent domain law, which, among other things, authorizes compensation for the loss of business goodwill." (*Community Development Com.* v. *Asaro* (1989) 212 Cal.App.3d 1297, 1301-1302 [261 Cal.Rptr. 231], fn. omitted (*Asaro*).)

■ "Section 1263.510 was enacted in 1975 as part of a comprehensive revision of eminent domain law in California. [Citations.] The section was enacted in response to widespread criticism of the injustice wrought by the Legislature's historic refusal to compensate condemnees whose ongoing businesses were diminished in value by a forced relocation. [Citations.] The purpose of the statute was unquestionably to provide monetary compensation for the kind of losses which typically occur when an ongoing small business is forced to move and give up the benefits of its former location." (*Muller, supra,* 36 Cal.3d at p. 270; *Redevelopment Agency* v. *Arvey Corp.* (1992) 3 Cal.App.4th 1357, 1363 [5 Cal.Rptr.2d 161] (*Arvey*); *People* ex rel. *Dept. of Transportation* v. *Salami* (1991) 2 Cal.App.4th 37, 43 [2 Cal.Rptr.2d 833] (*Salami*); *Asaro, supra,* 212 Cal.App.3d at pp. 1301-1304.)[4] Section 1263.510 "is a remedial statute to. be construed liberally." (*People* ex rel. *Dept. of Transportation* v. *Leslie* (1997) 55 Cal.App.4th 918, 922 [64 Cal.Rptr.2d 252] (*Leslie*).)

■ A tenant "may possess goodwill *as owner of a business.*" (*City of Vista* v. *Fielder* (1996) 13 Cal.4th 612, 617, fn. 1 [54 Cal.Rptr.2d 861, 919 P.2d 151], italics in original.) The "Eminent Domain Law recognizes that, generally, a lessee is entitled to 'compensation for the value of his leasehold interest [taken], if any, and any of his property taken' therewith, including 'goodwill.' " (*Id.* at p. 616.)[5]

■ "Section 1263.510 provides a statutory right to compensation for loss of business goodwill, but remains silent on the question of how to properly value the loss of goodwill." (*Salami, supra,* 2 Cal.App.4th at p. 43, citing *Asaro, supra,* 212 Cal.App.3d at p. 1302.) As we noted in *Asaro,* in enacting section 1263.510 the Legislature did not specify any particular

---

[4]In recommending the Legislature act to "compensate the owner of a business taken or damaged in an eminent domain proceeding for losses he suffers," the Law Revision Commission stated "in order to assure that the losses are certain and measurable for the purposes of compensation, recovery should be allowed only for the loss of goodwill proved by the property owner and only to the extent that such loss is caused by the acquisition of the property or the injury to the remainder and cannot reasonably be prevented by a relocation of the business and by taking those steps and adopting those procedures that a reasonably prudent person would take and adopt in preserving the goodwill." (12 Cal. Law Revision Com. Rep. (Dec. 1974) p. 1653.)

[5]The record indicates Baja-Mex accepted compensation for fixtures and equipment taken by the City.

method for valuing loss of goodwill. (212 Cal.App.3d at p. 1302.) After reviewing statutory and case law, we did "not discern any hard and fast rule that there is an exclusive method for determining the value of the loss of goodwill in eminent domain proceedings." (*Id.* at p. 1305.) Further, as the Supreme Court has observed, ". . . the courts have wisely maintained that there is no single acceptable method of valuing goodwill. [Citation.] Valuation methods will differ with the nature of the business or practice and with the purpose for which the evaluation is conducted." (*Muller, supra,* 36 Cal.3d at p. 271, fn. 7; *Leslie, supra,* 55 Cal.App.4th at pp. 922-923; *Asaro, supra,* at p. 1303.) "[C]ourts have not laid down rigid and unvarying rules for the determination of the value of goodwill but have indicated that each case must be determined on its own facts and circumstances and the evidence must be such as legitimately establishes value." (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 583 [117 Cal.Rptr. 49], cited with approval in *Asaro, supra,* at p. 1305.)

In *Muller, supra,* 36 Cal.3d 263, in construing section 1263.510, the Supreme Court faced the issue "whether a condemnee may be compensated for loss of goodwill when he demonstrates that, as a result of a forced move, his business has lost profitability and has a reduced market value." (36 Cal.3d at p. 265.) The Supreme Court concluded the " 'excess income' method used by the expert witnesses is a reasonable method of quantifying the loss even though there are other acceptable methods for evaluating goodwill." (*Id.* at p. 272.)[6] Observing that characterizing lost profitability as goodwill was consistent with the definition of goodwill used in other contexts, the Supreme Court stated: "Courts have long accepted that goodwill may be measured by the capitalized value of the net income or profits of a business or by some similar method of calculating the present value of anticipated profits." (*Id.* at p. 271; *Leslie, supra,* 55 Cal.App.4th at p. 922.) As we observed in *Asaro, supra,* 212 Cal.App.3d 1297, the issue in *Muller* was "whether the loss of an economically beneficial lease which did not result in reduced patronage but did result in reduced profits because of a higher rent was compensable under section 1263.510. Muller presented evidence of the capitalized value of his profits at the old location and evidence that the value had been lost as a result of the move. The Supreme Court rejected the government's claim that loss of the lower rent was not

---

[6]"The capitalization of excess earnings approach values goodwill as follows. First, the net earnings of the business are computed by subtracting expenses and reasonable officers' salaries from gross earnings. Next, a percentage return which would 'normally' be expected from the value of the tangible assets of the business is calculated and then subtracted from the net earnings. The remaining figure, if any, is the 'excess' earnings of the business and is attributable to intangible assets, usually goodwill. The capitalized present value of the excess earnings is computed by dividing the excess earnings figure by a percentage which reflects current interest rates." (*Muller, supra,* 36 Cal.3d at p. 266, fn. 2.)

compensable as goodwill, holding section 1263.510 was intended to compensate Muller for this loss." (*Asaro, supra,* at pp. 1302-1303.) We also observed that "essentially the court in *Muller* held the value of goodwill is not limited to patronage but also includes the decrease in market value of a business caused by a forced relocation to more expensive premises." (*Asaro, supra,* at p. 1303, fn. 3.) Specifically, in *Muller, supra,* 36 Cal.3d 263, the Supreme Court stated that section 1263.510 "recognizes that 'location' is one of the 'circumstances' which results in 'retention of old or acquisition of new patronage.' The statute does not authorize compensation for a loss of patronage as such. It does authorize compensation for a loss of 'benefits' of 'location.' There are other benefits to a particular location besides patronage. While location unquestionably affects patronage—indeed, Dr. Muller chose his new location precisely because it would allow him to retain his old patronage—a given location may well carry additional benefits. Here, the old location carried the manifest benefit of a cheap rent in an older building. The statute authorizes a court to award compensation for the loss of this benefit." (*Muller, supra,* 36 Cal.3d at p. 269.) Noting section 1263.510 was to be construed liberally to foster its "evident" remedial purpose, the Supreme Court also stated: "The Legislature must certainly have been aware that a business which is forced to move will usually have to pay more for the purchase or rental of new quarters—particularly if it has been at the old location for a long time. An older building and a lower rent are among the most obvious 'benefits . . . of . . . location' which a small business stands to lose when it is condemned." (*Id.* at p. 270.) Hence, the Supreme Court concluded: "Clearly, Dr. Muller's loss comes within the statutory definition of compensable goodwill." (*Id.* at p. 272.)

In *Asaro, supra,* 212 Cal.App.3d 1297, we concluded ". . . a market analysis is among the acceptable approaches" in determining the value of a restaurant's goodwill in eminent domain proceedings. (*Id.* at pp. 1300, 1305.) Although the parties' experts in *Asaro* used the capitalization of excess income method to determine the value of goodwill, the government's expert applied a fair market value analysis to determine the capitalization rate (resulting in a low value of goodwill) while the property owners' experts based their calculations on the present value of the lost income stream (resulting in a higher value of goodwill). (*Id.* at p. 1301.) The trial court applied a fair market value analysis to determine the appropriate capitalization ratio. (*Ibid.*) Noting *Muller, supra,* 36 Cal.3d 263, did not discuss a fair market value analysis, the property owners in *Asaro* contended that *Muller* supported their experts' approach in determining the proper capitalization rate. In rejecting such contention, we stated *Muller* "clearly does not limit courts to any one method of measuring goodwill" and "does not rule out the

trial court's use here of a fair market approach to arrive at an appropriate capitalization rate." (212 Cal.App.3d at p. 1303.)[7]

## B

### The Record

#### 1

#### Brinig's Testimony

We summarize the trial testimony of Baja-Mex's expert Brinig:

A typical case would involve a decrease in net income after condemnation with the appraiser capitalizing the difference and arriving at value of lost goodwill based on reduction of net income. The excess earnings method was a subset of net income analysis. However, this case presented a unique situation where after condemnation the business operated by Baja-Mex as office No. 4 made more money than before the taking but nevertheless "suffered a meaningful and measurable loss of goodwill value."

Because Baja-Mex did not provide expense information, Brinig did not look at office No. 4's pretaking 1993 net income, its 1994 net income or its 1995 net income. However, a posttaking decrease in office No. 4's goodwill value was identifiable although not analyzed under a traditional methodology based upon net income. Analysis of the underlying characteristics affecting net income in the property's pretaking and posttaking conditions revealed the existence of a "fundamental difference" between those conditions. Specifically, office No. 4 experienced "an absolutely defined increase" in expenses after the condemnation and, "all other things being equal, those defined increases in expenses affect net income and affect goodwill." The phrase "all other things being equal" referred to Brinig's characterization of this case as "a classic from an economic [perspective], the laboratory case where there is the closest laboratory situation to an identical before-condition and an identical after-condition that could possibly exist in the real world." This case was "as close to a laboratory case where you can do this in the real world as" Brinig had seen.

Fundamental to Brinig's analysis was "the concept of before and after." Brinig focused on what change the taking caused in the business. Various

---

[7] In *Salami, supra,* 2 Cal.App.4th 37, the state's appraiser valued the property under three methods, to wit, market data, income, and replacement cost. (*Id.* at p. 41.) A commentator has noted that "traditional means of valuing goodwill" include capitalized excess earnings, gross income multipliers, and market value. (Maleck, *Loss of Business Goodwill in Eminent Domain Proceedings* (1978) 53 State Bar J. 32, 33.)

factors bearing on goodwill were essentially the same in both the pretaking and post-taking conditions, to wit, the business's name, its management, marketing, the industry, economic conditions, the effect of peso devaluation, and the business's reputation. The post-taking location after moving 10 feet was no better. Other circumstances bearing on goodwill were worse after the taking, namely, access to the building housing office No. 4's business operations, parking, and security in the absence of the compound configuration. Occupying a total square footage of 1,500 rather than 675 square feet was "insignificantly better." Internal design was better but "absolutely insignificant in terms of generating revenues." The furniture store's new internal configuration with six cashier windows was perhaps a "bit better" because patrons had the opportunity to come inside. The business's financing was the same except to the extent it was better or stronger due to additional financing obtained based on the significant increase in posttaking gross revenues resulting primarily from Mexican peso devaluation.

Although post-taking gross revenues increased "dramatically" in a manner that would generate "substantial net income" primarily due to peso devaluation, the characteristics affecting pretaking and post-taking goodwill were "virtually identical except for some of them being worse, measurably worse." Such fact was necessarily taken into consideration in Brinig's "analysis of the benefits of the old location versus the benefits of the new location, which is essentially a goodwill analysis." Brinig's analysis of those characteristics permitted identification of benefits of the old location lost as a result of the taking. The measure of the "identifiable benefits of the old location" was "the fact that in the old location there were a group of expenses that were lower as a result of the rental situation and the configuration of the location, and those expenses being rent and wages, are higher in the new location." Characteristics of "access, security, and parking" related to the post-taking parking situation were worse. "The parking was better in the compound situation, and the security was better in the compound situation," as demonstrated by Baja-Mex's hiring more employees to cover the reconfigured parking area. As a result of such economic damage, Baja-Mex suffered a loss of goodwill. The "costs of the loss of benefit" Baja-Mex suffered could be measured.[8]

Analysis of the value of the economic loss related to loss of the parking configuration benefit revealed specific expenses that increased as a result of the taking but did "not give the business any benefit other than maintaining

---

[8]Brinig testified: "I would suggest if all other things stay approximately equal and they incur additional expenses just to do that, then that—those additional expenses can be measured, and that is not met with the response that says, 'Oh, but they're significantly better off,' because it's my position that all other things remain approximately equal."

their approximately equal position in the old and in the new." The factors causing an economic loss relating to loss of the parking configuration were "the net increased rental cost" resulting from the changed configuration and "the net increased wage expense as a result of providing more coverage." Such net increased rental amount existed because (1) when the City razed the free-standing small building Baja-Mex moved into the furniture store building, lost sublease income from the furniture store building, and thus effectively increased its net rental cost; (2) Baja-Mex lost subtenants in the trailer; and (3) Baja-Mex incurred half of the rent for the Quonset hut parcel to protect its business's parking situation. The monthly increase in net rental costs between the pretaking and post-taking conditions was calculated, projected to the end of the lease and discounted to present value. The net increase in monthly rent cost was an "absolute permanent" economic damage Baja-Mex suffered as a result of the condemnation without receiving any betterment. The past loss component of the increase in rental expense was also calculated. Further, the net "increased wage expenses" reflected the increased number of hours that parking lot attendants were on the premises after condemnation. Such increase would be experienced "permanently" without measurable benefit other than supervision of the entire parking area. The difference between the monthly wage costs in the pretaking and post-taking conditions was calculated, projected into the future and reduced to present value. The increased wage expenses also had a past loss component. All other factors were essentially equal. The circumstances were "as close to a laboratory situation as" Brinig could "imagine in the real world."

The post-taking traffic signal at office No. 4's front intersection, the increase in the business operations' square footage, and the improved look of the inside of the furniture store building perhaps constituted economic betterments but were insignificant and not measurable with respect to an increase in the business's profitability.

Brinig's analysis of increased expenses was "specific to this business" and not in a "vacuum." Brinig calculated Baja-Mex suffered $389,760 compensable loss of goodwill. Brinig believed from an accountant's standpoint it was improper for a "strategic reason" to do a traditional goodwill loss analysis. Brinig stated: "There's no question that in my mind, in my opinion, if you look at the goodwill, a pure analysis of the goodwill before, and you look at a pure analysis of the goodwill after, there is an increase, and—but that increase I frankly think is misleading because when you identify the factors of the before- and after-condition, you see that there is one factor—two factors, I think, that changed, and those changes are directly related to a permanent increase in expenses, and I believe all other things are equal." Brinig thus concluded the "change in net income" should be analyzed through expenses that occur and are assigned "to the taking."

### 2

### *The Parties' Arguments to the Trial Court*

The City argued that by not conducting a net income analysis Brinig did not value goodwill in the business's pretaking condition but instead employed an assertedly inappropriate and unacceptable "capitalization of increased expenses analysis" effectively isolating selected post-taking cost increases in a vacuum. The City concluded that by not valuing pretaking goodwill Brinig could not establish the existence or loss of any such goodwill.

Characterizing Brinig's methodology as sound and appropriate for the circumstances, Baja-Mex argued that any isolated expenses occurring as a result of the loss of a benefit of the property's pretaking location were compensable under section 1263.510 and *Muller, supra,* 36 Cal.3d 263. Baja-Mex asserted that after valuing benefits accruing to its business as a result of both its pretaking and post-taking locations, Brinig properly concluded Baja-Mex lost the benefits of the pretaking compound configuration, parking, access, security and subtenant rental income while other factors bearing on goodwill remained essentially the same. Specifically, Baja-Mex asserted the condemnation resulted in an increase in its net expenses for rent and wages. Baja-Mex also argued it incurred those increased net expenses to mitigate damages it would have otherwise suffered by relocating elsewhere.

### 3

### *The Trial Court's Decision*

Concluding Brinig's approach was not an acceptable method of valuing goodwill and there was no evidence that it was acceptable, the trial court granted the City's motion to strike Brinig's testimony. After rejecting Baja-Mex's additional claim for mitigation expenses as merely a means to circumvent the ruling excluding Brinig's goodwill testimony, the court granted judgment favoring the City.

### C

### *Analysis*

### 1

### *Goodwill*

Evidence Code section 801 limited Brinig's expert opinion testimony on the existence and loss of goodwill to an opinion based on matter

"of a type that reasonably may be relied upon by experts in forming an opinion upon the subject to which his testimony relates. In large measure, this assures the reliability and trustworthiness of the information used by experts in forming their opinions." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 801, p. 21.)[9] In ruling on foundational matters forming the basis of Brinig's opinion testimony, the superior court enjoyed broad discretion. (*Korsak* v. *Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [3 Cal.Rptr.2d 833]; Evid. Code, § 803.)[10] Hence, in reviewing Baja-Mex's claim that the court erred in excluding Brinig's testimony, we apply an abuse of discretion standard. (*Korsak* v. *Atlas Hotels, Inc., supra,* at p. 1522.) Since Brinig's testimony about the existence and loss of goodwill was founded upon matter insufficient to form a proper basis for such opinion, we conclude the court acted within its discretion in excluding such testimony.

In order to be awarded compensation for goodwill, Baja-Mex was statutorily required to prove that its alleged loss of goodwill was caused by the taking, could not be prevented by relocation, would not include relocation expenses, and would not be duplicated by compensation otherwise awarded to Baja-Mex. (§ 1263.510.) Thus, Baja-Mex had the burden to prove entitlement to goodwill. (*Redevelopment Agency* v. *Thrifty Oil Co.* (1992) 4 Cal.App.4th 469, 474-475 [5 Cal.Rptr.2d 687]; *Salami, supra,* 2 Cal.App.4th at p. 45; *Redevelopment Agency* v. *Metropolitan Theatres Corp.* (1989) 215 Cal.App.3d 808, 811 [263 Cal.Rptr. 637].) On this record the superior court properly concluded Brinig's testimony was inadmissible for purposes of establishing that Baja-Mex was statutorily entitled to compensation for loss of goodwill.

The goal of these eminent domain proceedings was "to determine just compensation," to wit, to put Baja-Mex in "as good a position" as if its property had "not been taken." (*Leslie, supra,* 55 Cal.App.4th at p. 923.) "A condemnation trial is a sober inquiry into values, designed to strike a just balance between the economic interests of the public and those of the landowner." (*Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v.

---

[9] Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

[10] Evidence Code section 803 provides in relevant part: "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion."

*Reed* (1963) 215 Cal.App.2d 60, 69 [29 Cal.Rptr. 847].) " ' "In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value." ' " (*County Sanitation Dist.* v. *Watson Land Co.* (1993) 17 Cal.App.4th 1268, 1282 [22 Cal.Rptr.2d 117].) Where, as here, "an expert in a condemnation action employs a methodology not sanctioned by California law, his opinion may be excluded." (*Ibid.*) ▇ Since Brinig's opinion testimony on the existence and loss of goodwill lacked the necessary foundation, the superior court acted within its discretion in excluding his testimony. (*Ibid.*) As one appellate court has observed, "There is a limit to imaginative claims . . . . To say that only the witness' valuation opinion has probative value, that his 'reasons' have none, ignores reality. His reasons may influence the verdict more than his figures. To say that all objections to his reasons go to weight, not admissibility, is to minimize judicial responsibility for limiting the permissible arena in condemnation trials. The responsibility for defining the extent of compensable rights is that of the courts." (*Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed, supra,* at p. 69.)

Acknowledging that application of the traditional methodology of comparing the value of a business's goodwill in its pretaking and post-taking conditions would result in a determination that the goodwill of Baja-Mex's office No. 4 increased after the condemnation, Brinig testified he did not employ such traditional approach. Instead, without determining the actual value of goodwill before or after the taking, Brinig analyzed goodwill as the increased rent and wage costs at the post-taking location. However, although characterized by Brinig as reasonable and appropriate in this assertedly unique situation, his valuation methodology was insufficient to establish the existence or loss of any goodwill.[11]

Although no "single method exists to value goodwill" (*Leslie, supra,* 55 Cal.App.4th at p. 923, citing *Muller, supra,* 36 Cal.3d at p. 271, fn. 7) and courts have not prescribed "rigid and unvarying rules" for determining the value of goodwill, ". . . *the evidence must be such as legitimately establishes value.*" (*In re Marriage of Foster, supra,* 42 Cal.App.3d at p. 583, italics added; *Asaro, supra,* 212 Cal.App.3d at p. 1305.) For example, in *Muller* the Supreme Court stated that goodwill must "be measured by a method which excludes the value of tangible assets or the normal return on those assets."

---

[11] We note that Brinig could not testify about office No. 4's net income in its pretaking or post-taking conditions because for the years after 1992 Baja-Mex did not provide the segregated information about such office's expenses that would have permitted calculation of its net income. Further, Baja-Mex did not otherwise produce any written study comparing office No. 4's net income, profitability or parking availability before and after condemnation. Moreover, Baja-Mex never compared the number of transactions at office No. 4 in its pretaking location with those in its post-taking location.

(36 Cal.3d at p. 271, fn. 7.) The Supreme Court also observed: "Courts have long accepted that goodwill may be measured by the capitalized value of the net income or profits of a business or *by some similar method of calculating the present value of anticipated profits.*" (*Muller, supra,* 36 Cal.3d at p. 271, italics added; *Leslie, supra,* at p. 922.) However, Brinig's methodology did not calculate the present value of office No. 4's anticipated profits or otherwise legitimately establish the existence or loss of any goodwill. (*Muller, supra,* at p. 271; *Leslie, supra,* at p. 922; *Asaro, supra,* at p. 1305; *In re Marriage of Foster, supra,* at p. 583.)

Employing an approach he characterized as crafted to the specific circumstances of this case affecting patronage, Brinig concluded that despite enjoying an increase in income at office No. 4's post-taking location due to devaluation of the Mexican peso unrelated to condemnation, Baja-Mex nonetheless suffered a post-taking loss of benefits that had accrued from its pretaking location and that constituted lost goodwill measurable by identifiable post-taking permanent net increases in expenses for employee costs and rental payments while other factors bearing on goodwill remained neutral or changed insignificantly. As discussed, those factors considered by Brinig were the business's name, management, reputation, financing, marketing, the industry, economic conditions, the effect of peso devaluation, the 10-foot difference in the location of business operations, access to the building housing the business operations, parking, security, total square feet occupied, the furniture store's internal configuration, and interior design. Brinig also testified that in this "unique" case his methodology of analyzing the change in net income through increased expenses caused by the taking was from an accountant's standpoint a proper approach for valuing Baja-Mex's loss of goodwill. However, Brinig's opinion testimony was not based on a foundation sufficient to establish the existence and loss of goodwill. (Evid. Code, § 801.)

Brinig did not measure the value of office No. 4's alleged intangible asset of goodwill in the business's pretaking or post-taking condition.[12] Hence, Brinig never compared the value of goodwill before condemnation with its value after condemnation. Indeed, at deposition Brinig admitted he "never actually sat down and calculated" the business's goodwill. Further, although this case involved alleged cost increases for rent and wages as well as increased revenues at office No. 4's larger post-taking location, Brinig did not compare the business's income or losses in its pretaking and posttaking conditions. Instead, Brinig focused only on increased isolated costs after condemnation while disregarding any post-taking revenue increases attributable to expanded services or any post-taking cost increases related to occupancy of a larger space, the new pension plan, use of additional

---

[12]Baja-Mex acknowledges the exact value of the benefits of the pretaking location "would be difficult, if not impossible, to determine."

employees in providing expanded services, and sharing of employees with other Baja-Mex locations.

In sum, Brinig's methodology was limited to capitalizing and discounting isolated increased costs arising from Baja-Mex's office No. 4's post-taking access, rental income, security and parking. Brinig concluded those identified increased costs were equivalent to loss of goodwill since other factors bearing on goodwill remained substantially the same. According to Brinig, he essentially applied a net income analysis tailored to this specific situation where measurable post-taking changes occurred only in the business's increased expenses for rent and wages. Hence, Baja-Mex contends Brinig effectively valued goodwill in the pretaking and post-taking conditions by determining other potential factors to be insignificant and attributing revenue increases to the Mexican peso devaluation. However, Brinig's methodology was inadequate to measure the value of any pretaking goodwill or to compare any such value with the value of post-taking goodwill.

Brinig approached valuation of office No. 4's goodwill as a laboratory exercise rather than as an empirical measure of what actually existed. Stated otherwise, instead of quantifying in dollars the elements constituting the business's alleged goodwill, Brinig sought to determine goodwill by analyzing various factors bearing on the business's functioning. However, although perhaps working in a laboratory, Brinig's methodology failed here because of the practical impossibility of accounting for the countless variables potentially affecting a business's profitability in the real world. By attempting to predict Office No. 4's profitability without calculating and verifying its actual revenues, expenses and profits, Brinig accomplished nothing toward the goal of determining the existence and true measure of any goodwill. Thus, since not based upon a quantified and verified comparison of patronage-related benefits accruing to the business before and after condemnation, Brinig's testimony about the value of loss of goodwill did not meet the statutory requirements for admissibility as an expert opinion. (Evid. Code, § 801.) Although Brinig was not required to use the capitalization of excess earnings method approved in *Muller, supra,* 36 Cal.3d 263, the market analysis approved in *Asaro, supra,* 212 Cal.App.3d 1297, the capitalization of increased annual operating expenses approach discussed but not specifically approved in *Leslie, supra,* 55 Cal.App.4th 918,[13] or any other specific methodology in valuing goodwill, nothing in the case law or statutory authority suggests that calculating isolated increased expenses without establishing the existence of actual pretaking goodwill and comparing its

---

[13]Unlike the expert appraiser in *Leslie, supra,* 55 Cal.App.4th 918, Brinig did not calculate goodwill loss based upon capitalized increased annual operating expenses. (*Id.* at p. 921.) Instead, Brinig simply capitalized various isolated additional costs after condemnation.

value with post-taking goodwill would under any circumstances constitute an appropriate methodology for evaluating loss of goodwill. Hence, on this record the trial court acted within its discretion in excluding Brinig's expert opinion testimony. (Evid. Code, § 803.)

2

*Mitigation*

After the superior court granted the City's motion to strike Brinig's testimony, Baja-Mex claimed entitlement to recovery of "mitigation expenses as a lost goodwill component." Citing *Muller, supra,* 36 Cal.3d 263, and *Arvey, supra,* 3 Cal.App.4th 1357, Baja-Mex contended that section 1263.510, subdivision (a)(2), imposed an obligation to mitigate loss of goodwill and such mitigation expenses then became compensable as lost goodwill.[14] Hence, asserting Brinig's testimony established the existence of "an economic loss related to the increased expense that the business has incurred in an effort to mitigate their damages," Baja-Mex concluded "those mitigation expenses are compensable in this action." The superior court rejected Baja-Mex's claim for mitigation expenses. In declining to permit Baja-Mex to recover as mitigation expenses its asserted loss of goodwill, the court stated: "You can't come around in another direction and claim recovery for it just calling it something else."

Baja-Mex contends that even if it was not entitled to damages for loss of goodwill under section 1263.510, it was nonetheless entitled to recover mitigation costs "independent" of its rejected claim for loss of goodwill. Characterizing those mitigation costs as "the same expenses that were used to determine [its] loss of goodwill," Baja-Mex claims entitlement to recovery since Brinig assertedly determined such expenditures were actually made and represented an economic loss to Baja-Mex. However, the superior court properly denied Baja-Mex's request for mitigation costs.

---

[14]In *Muller, supra,* 36 Cal.3d 263, the Supreme Court rejected the government's contention that section 1263.510 authorized compensation only for losses attributable to loss of patronage. (36 Cal.3d at p. 269.) In rejecting the contention that there was compensable loss of goodwill only when there was a loss of patronage, the Supreme Court stated: "Under the Department's definition of goodwill, Dr. Muller would also be entitled to compensation for expenses reasonably incurred in an effort to prevent a loss of patronage. [Citation.] It appears that his expenses—the higher rent at the new location—were incurred in a reasonable (and apparently successful) effort to prevent a loss of patronage. The Department conceded as much in its trial brief and on this appeal. Thus, had the case been tried on a theory that the higher rent was reasonably necessary to mitigate a threatened loss of patronage, Dr. Muller might well have been awarded the same recovery." (*Id.* at pp. 271-272.)

Citing *Muller, supra,* 36 Cal.3d at pages 271-272, the appellate court in *Arvey, supra,* 3 Cal.App.4th 1357, stated: "The Eminent Domain Law . . . requires the owner of the property to take steps to mitigate the loss of goodwill. (§ 1263.510, subd. (a)(2).) Such mitigation expenses then become compensable as lost goodwill." (*Id.* at p. 1361.)

On this record Baja-Mex was not entitled to recover its alleged loss of goodwill under the designation of mitigation expenses. Baja-Mex's claim for mitigation costs compensable as lost goodwill was based solely on Brinig's testimony.[15] However, Baja-Mex could not recover its expenses incurred in allegedly mitigating its loss of goodwill unless it showed the existence of goodwill. As discussed, the trial court properly excluded Brinig's testimony on Baja-Mex's claim for loss of goodwill as not measuring such alleged loss because Brinig's methodology failed to establish the existence or value of any goodwill. Since based on a methodology not establishing the existence or value of any goodwill, Brinig's testimony was similarly inadmissible on Baja-Mex's attempt to recover mitigation costs as lost goodwill.

In sum, the trial court properly found Baja-Mex's claim for mitigation expenses was simply a means to attempt to circumvent its ruling excluding Brinig's testimony on goodwill. Hence, the court correctly rejected Baja-Mex's mitigation claim and then granted judgment favoring the City.

IV

DISPOSITION

The judgment is affirmed.

Benke, J., and Huffman, J., concurred.

The petition of all appellants for review by the Supreme Court was denied September 2, 1998.

---

[15]As noted, in seeking to recover mitigation costs in the trial court Baja-Mex acknowledged those costs were "the same expenses" that Brinig used to determine its "loss of goodwill." Earlier at trial Baja-Mex acknowledged it incurred the increased net expenses for rent and wages assertedly constituting lost goodwill to mitigate damages it would have otherwise suffered by relocating elsewhere. In its reply brief Baja-Mex acknowledges that after quantifying the "additional expenses" it incurred in "mitigating this loss" of pretaking locational benefits of compound configuration, low net rents and parking, Brinig determined that such quantified expenses "represented lost goodwill under section 1263.510."